**CENTRAL ALABAMA PAVING, INC.; Capital City Asphalt Co., Inc.; Morris-Shea Bridge Co., Inc.; Ellard Contracting Company, Inc.; New Mc, Inc.; Harris & Vines Contracting Company; Alabama Road Builders Association, Inc.; and Starr & Sons, Incorporated, Plaintiffs,**

v.

**Fob JAMES, Governor of the State of Alabama; The State of Alabama Highway Department; Bobby J. Kemp, Director of the State of Alabama Highway Department; E. Jerome Kelley, Minority Business Enterprise Liaison Officer of the State of Alabama Highway Department, Defendants and Third Party Plaintiffs,**

v.

**Neil GOLDSCHMIDT, Secretary, United States Department of Transportation; United States Department of Transportation; and Lewis MacDonald, Division Administrator, Federal Highway Administration, Third Party Defendants.**

Civ. A. No. 80–358–N.

United States District Court,
M. D. Alabama, N. D.

Oct. 10, 1980.

---

James T. Upchurch, III, Robert A. Huf-
faker, Rushton, Stakely, Johnston & Gar-
rett, Montgomery, Ala., for plaintiffs.

D. Frank Davis, Joseph W. Letzer, Asst.
Attys. Gen. of Alabama, Thomas, Taliafer-
ro, Forman, Burr & Murray, Birmingham,
Ala., for all defendants and third party
plaintiffs.

Barry E. Teague, U. S. Atty. (Kenneth E.
Vines, Asst. U. S. Atty.), Montgomery, Ala.
and Richard Ugelow, Federal Enforcement
Section, Civil Rights Division, Washington,
D. C., for all third party defendants.

## MEMORANDUM OPINION

HOBBS, District Judge.

This action was commenced on August
29, 1980 by the filing by plaintiff contrac-
tors of a motion for a temporary restraining
order seeking to have the Court enjoin the
Governor of the State of Alabama, the
State of Alabama Highway Department
and its Director, and Jerome Kelley, as the
Minority Business Enterprise Liaison Offi-
cer, from implementing and enforcing pro-
visions of the State of Alabama Highway
Department Minority Business Enterprise
program which required that only bids
which had a percentage of the work award-
ed to Minority Business Enterprises or
Women Business Enterprises (hereinafter
referred to as MBEs and WBEs, respective-
ly) would be considered in awarding State
highway contracts. Plaintiffs contended
that this program of the State of Alabama
Highway Department violated their rights
under the Fourteenth Amendment to the
United States Constitution, §§ 1981 and
1983 of Title 42 of the United States Code,
as well as Title VI of the Civil Rights Act
of 1964. The program was also challenged
as violative of the Federal Highway Act, 23
U.S.C. § 101 et seq. Finally, plaintiffs con-
tended the regulations of the United States
Department of Transportation (hereinafter
referred to as DOT) violated their rights
under the Fifth Amendment of the Consti-
tution.

The challenged MBE and WBE program
was promulgated pursuant to directives of
DOT.

A hearing was held on September 2, 1980
on plaintiffs' motion for a temporary re-
straining order. Because the challenge to
the Alabama Highway Department MBE
and WBE program was an attack on the
regulations of DOT and because DOT was
not represented at that hearing, this Court
denied plaintiffs' motion for a temporary
restraining order, and set plaintiffs' motion
for a preliminary injunction for a hearing
on September 26, 1980. Parties were di-
rected to file briefs prior to the hearing and
the Court granted leave to the parties to
proceed with the taking of depositions on
an expedited basis pursuant to Rule 30(a) of
the Federal Rules of Civil Procedure.

The Alabama defendants filed a third
party complaint on September 2, 1980,
which in effect asserted that its MBE and
WBE program was required by DOT in
order for the State of Alabama to partici-
pate in the federal funding of Alabama
highways, and the Alabama defendants
made DOT and Mr. Goldschmidt as its Di-
rector, and Mr. MacDonald as its Division
Administrator, third party defendants. By
an amendment to their third party com-
plaint which was filed on September 23,
1980, the Alabama defendants prayed that
this Court enjoin the third party defendants
from enforcing the DOT rules and regula-
tions and require the third party defendants
to fund Alabama highway projects without

certain of the MBE and WBE requirements. The third party complaint filed by the Alabama defendants asserts, as does the complaint of the original party plaintiffs, that the DOT rules and regulations violate the United States Constitution by requiring a preference based on race, sex and national origin. The third party complaint also charges that DOT's regulations violate federal statutes and Executive Orders.

At the hearing on September 26, 1980, all parties were present and participated in the argument. Numerous depositions, affidavits and exhibits were admitted in evidence. Exhaustive briefs have been filed.

On consideration of the evidence, the briefs, and the arguments of counsel, the Court concludes that the preliminary injunction should be granted.

## FACTS

In 1980, DOT adopted new rules and regulations which required the state highway departments to submit percentage "goals" for fiscal year 1981 for MBEs and WBEs by October 1, 1980.[1] An MBE is defined in the DOT regulations as a business which is at least owned 51 per cent by one or more minorities or women. Minorities are defined as Blacks, Hispanics, Asian Americans, American Indians, Alaskan natives, or members of other groups found to be economically or socially disadvantaged.

The Alabama Highway Department has been advised by appropriate representatives of DOT that if fixed percentage goals are not submitted by October 1, 1980, no federal funding will be available for future highway projects in Alabama. DOT set the goals for each region in the country by equating each region's percentage of the 1979 fiscal year federal aid dollars and applying that percentage to the fiscal year 1980 MBE goal. (Ex. 5 to Stump depo.) No attempt was made to allocate the goals

on the basis of any finding of discrimination in the letting of highway projects. (Brooks depo., pp. 24–25) At the hearing, counsel for DOT conceded that DOT had made no findings of any past discrimination against WBEs insofar as highway contracts were concerned. The basis for the requirement that a percentage of contracts be awarded WBEs was based solely on the statistics which show nationwide an underrepresentation of WBEs receiving contracts for highway construction.

The first MBE program submitted by the Alabama Highway Department was rejected by DOT. Under the DOT requirement of having its goal approved or receiving no federal funds, the Alabama Highway Department has submitted a second MBE program. Alabama defendants were advised that unless its plan had minimum goals of 2.75 per cent for MBEs and 1 per cent for WBEs, it would not be approved. (Kelley depo., pp. 13–14; Ex. 5 to Quick depo.; Ex. 21 to MacDonald depo.; Kemp depo., pp. 100–102).

For the first time the DOT regulations promulgated March 31, 1980, provided that if any contractor offering a reasonable price "meets the MBE contract goal," then "the recipient (the State Highway Department) shall presume conclusively that all competitors that fail to meet the goal have failed to exert sufficiently reasonable efforts and consequently are ineligible to be awarded the contract." Fed.Reg. Vol. 45, No. 63, p. 21188.

Although the regulations expressly state that they constitute a "major change in approach" to the selection of successful bidders, no new notice of proposed rulemaking was published on the final regulations to allow public comment or input in the new contract selection approach. It is conceded that the belated edition of Title VI as a statutory basis for the regulations was not approved as required by Title VI. (Stipula-

---

1. Although the DOT regulations refer to these percentages which must be submitted as "goals," the Alabama defendants insist that they are "quotas." Hereinafter in this opinion, these percentages will be referred to as "goals," but the labelling should not be treated as decisive. The words of Justice Powell in *University of California Regents v. Bakke*, 438 U.S. 265, 289, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 are relevant: "Whether this limitation is described as a quota or a goal, it is a line drawn on the basis of race and ethnic status."

tion of counsel in Horton's deposition at page 145)

The necessary components of each MBE program which must be submitted by each state's highway department are set out in the DOT regulations. For example, the program must contain a policy statement expressing a commitment to the use of minority business. It must contain procedures to assure that affirmative action techniques will be employed to facilitate MBE participation. It must contain assurances that participants will encourage prime contractors to use minority owned banks or banks owned by women. It must insure that the recipient has a directory to identify MBEs which is available to bidders. The regulations forbid any discrimination based on race or sex and impose sanctions. None of these requirements of the program is challenged.

The challenge by the original plaintiffs and the third party plaintiffs is to the requirement of the regulations of an overall fixed percentage goal, and the further requirement that no bid may be considered by a bidder on any specific contract if that bid fails to meet the goal for MBEs and WBEs if another bidder, though its bid is higher, submits a bid deemed reasonable by the DOT.

### STANDING OF PARTIES TO CHALLENGE FEDERAL REGULATIONS AND ALABAMA MBE PROGRAM

■ The State of Alabama has standing to seek declaratory and injunctive relief with respect to the federal regulations which they are here challenging. See, *State of Alabama v. Tennessee Valley Authority*, 467 F.Supp. 791 (N.D.Ala.1979); *Islesboro School Committee v. Califano*, 593 F.2d 424 (1st Cir. 1979).

■ The original party plaintiffs also have standing to challenge the Alabama MBE plan and the federal regulations. In *Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 F.2d 159 (3rd Cir. 1971), the court stated: "Since the contractor plaintiffs . . . as bidders are directly impacted by the requirement that they agree

in their bid to comply with the Plan, (they) clearly have standing." 442 F.2d at 166. The Court of Appeals in this case relied on *Abbott Lab. v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). See also *Fullilove et al. v. Klutznick etc. et al.*, —— U.S. ——, 100 S.Ct. 2758, 65 L.Ed.2d 902, 1980.

Subject to the guidelines and limitations laid down in such cases, the granting or denial of a preliminary injunction rests in the sound discretion of the district court. *Clements Wire & Mfg. Co. v. NLRB*, 589 F.2d 894 (5th Cir. 1979); *Johnson v. Radford*, 449 F.2d 115 (5th Cir. 1971). The Court of Appeals has established four prerequisites to the granting of a temporary injunction, *Henry v. First Nat. Bank of Clarksdale*, 595 F.2d 291 (5th Cir. 1979)–first, a substantial likelihood that plaintiff will succeed on the merits; second, a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; third, the threatened injury to plaintiff outweighs the threatened harm an injunction may cause the defendant; fourth, grant of a preliminary injunction will not disserve the public interest.

### LIKELIHOOD OF SUCCESS ON THE MERITS

#### *The Statutory Challenge*

■ Plaintiffs and third party plaintiffs contend that the DOT regulation violates the federal competitive bid statute. 23 U.S.C. § 112(b) provides in pertinent part as follows:

Contracts for the construction of each project shall be awarded only on the basis of the lowest responsive bid submitted by a bidder meeting established criteria of responsibility . . .

This statute does not require contracts to be awarded on the basis of the lowest bid, but rather on the basis of the "lowest responsive bid." It is the opinion of the Court that DOT, through its regulations, has merely established an additional qualification for responsiveness. Thus, the challenged DOT regulation is not in violation of 23 U.S.C. § 112(b).

### Constitutional Challenge

The history of racial discrimination in this country needs no proof. It has been fully proven, and all with eyes have seen evidence of its ill effects. The Supreme Court in a number of cases has upheld actions which were taken to relieve the effects of racial discrimination. See, e. g., *Swann v. Charlotte Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

Most recently, the Supreme Court recognized a wide latitude in Congress to fashion relief of the type sought here by the DOT regulations. *Fullilove v. Klutznick, supra.* The Supreme Court also has upheld acts of Congress which award economic advantages to women which are denied to men where the purpose of such gender–based distinction was "the permissible one of redressing our society's longstanding disparate treatment of women." *Califano v. Goldfarb*, 430 U.S. 199, 209 n.8, 97 S.Ct. 1021, 1028 n.8, 51 L.Ed.2d 270 (1977).

The concept of affirmative action to secure greater participation in public and private programs is not new. As already noted, DOT has had an affirmative action program for a number of years. In March of 1980, DOT reported that its affirmative action efforts over the preceding five years had resulted in a 600 per cent increase in MBE participation in the highway programs of the states across the country, which it expressed as being "a most encouraging trend." This suit does not involve any challenge to such efforts.

The issue before this Court is a narrow one. The Supreme Court in its recent decision in *Fullilove v. Klutznick, supra*, faced the question whether a provision of the Public Works Employment Act of 1977 requiring that 10 per cent of all federal funds expended for public work projects be "set aside" for minority business enterprises violated the Equal Protection requirements

under the Fifth Amendment to the Constitution and Title VI of the Civil Rights Act. While the Supreme Court did not agree on a majority opinion, six of the Justices concurred in the judgment to uphold the authority of Congress to require a "set aside" for minority businesses under the Public Works Employment Act. If the "set aside" or goals or quotas prescribed in this case by DOT–at least to the extent that they applied to racial minorities–had been enacted by Congress, this Court would feel bound by *Fullilove* and would hold such goals to be consistent with the Constitution.

The narrow question here is whether such regulations requiring different treatment based on the race and sex of the contractors are consistent with the Constitution where Congress has not commanded such disparate treatment but rather such different treatment is required by a regulation imposed by an agency of the government.

In *Fullilove*, at least two Justices made it clear that they thought Congress itself was forbidden by the Constitution to accord a preference to citizens because they are "Negroes, Spanish–speaking, Orientals, Indians, Eskimos and Aleuts." The thrust of this opinion of Justice Stewart, joined in by Justice Rehnquist, is that "under the Constitution, the government may never act to the detriment of a person solely because of that person's race."[1] Their opinion made clear their view that the Constitutional "rule cannot be any different when the persons injured by a racially biased law are not members of a racial minority." Accordingly, they expressed their opinion that the MBE set–aside provision was unconstitutional because of its denial of equal protection of the law even though Congress itself had commanded the set aside.

Justice Stevens in a separate opinion expressed his conviction that because racial characteristics so seldom provide a relevant basis for disparate treatment and because classifications based on race are potentially so harmful to the entire body politic, it is

---

**1.** Justices Stewart and Rehnquist of course recognized that a court may take race into account in devising a remedial decree to undo a violation of a law which prohibited discrimination on the basis of race.

especially important that the reasons for such classification be clearly identified and unquestionably legitimate. He found fatal fault with Congressional action which lumped together Negroes, Spanish–speaking Americans, Orientals, Eskimos and Aleuts without any recitation of the economic, social, geographical or historical criteria for inclusion of the named groups and the exclusion of other groups. He was critical of the Congressional failure to explain why the set aside or goal had been put at the figure denominated in the Act. Predictably, he would find the lumpings in the DOT regulation at least equally without any demonstrable basis.

Justice Stevens expressed his conviction that the amount of the award to persons suffering from past wrongs must bear a rational relationship to the extent of the harm it is intended to cure. He failed to see how past wrongs to Blacks in America could justify special grants to Eskimos or Indians. Again, his words clearly have at least equal import when measured against the challenged DOT regulations: "Although I do not dispute the validity of the assumption that each of the subclasses identified in the Act has suffered a severe wrong at some time in the past, I cannot accept this slapdash statute as a legitimate method of providing classwide relief." The set–aside figure in the instant case is based on a formula totally unrelated to a figure required to remedy any past wrong.

Justice Stevens would hold the set aside in that 1977 Act of Congress unconstitutional under the Fifth Amendment because Congress failed "to demonstrate that its unique statutory preference" based on race or national origin was "justified by a relevant characteristic that is shared by members of the preferred class." In the view of Justice Stevens, it would appear that the challenged DOT regulations are at least as fatally flawed.

Justice Powell wrote a separate opinion in *Fullilove* which stressed the fact that the Court was construing an Act of Congress, and the enforcement clauses of the Thirteenth and Fourteenth Amendments confer upon Congress the unique authority to select reasonable remedies to advance the compelling state interest in repairing the effects of discrimination. Again and again, he referred to the scope of Congressional discretion. He stated:

My view that this set aside is within the discretion of Congress does not imply that other methods are unavailable to Congress. Nor do I conclude that use of a set aside always will be an appropriate remedy *or that the selection of a set aside by any other governmental body would be constitutional.* ... The degree of specificity required in the findings of discrimination and the breadth of discretion in the choice of remedies *may vary with the nature and authority of a governmental body.* (emphasis added)

He concluded his opinion: "But the issue here turns on the scope of Congressional power, and Congress has been given a unique constitutional role in the enforcement of the post–Civil War Amendments. In this case, where Congress determined that minority contractors were victims of purposeful discrimination and where Congress chose a reasonably necessary means to effectuate its purpose, I find no constitutional reason to invalidate" the set aside provisions of the Act.

The opinion of Chief Justice Burger in *Fullilove* which was joined in by Justices White and Powell also emphasized that the Court was considering an Act of Congress. The opinion pointed out that Congress is charged by the Constitution with the duty "to enforce by appropriate legislation the equal protection guarantees of the Fourteenth Amendment." Chief Justice Burger in explaining the deference to be accorded the Congressional action under consideration in *Fullilove* stated: "Here we pass, not on a choice made by a single judge or a school board but on a considered decision of the Congress and the President."

Chief Justice Burger's opinion again stated:

"... in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Con-

gress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees."

He further wrote: "That the program may press the outer limits of Congressional authority affords no basis for striking it down."

Chief Justice Burger's opinion also pointed out "the abundant evidence from which Congress could conclude that minority businesses have been denied effective participation in public contracting opportunities by procurement practices that perpetuate the effects of prior discrimination." Counsel for DOT conceded that the only evidence of discrimination as to WBEs was the statistical evidence that women are underrepresented in the highway contracting business.

Finally, Chief Justice Burger's opinion has an eloquent quote from Justice Jackson in his book, *The Struggle for Judicial Supremacy* 321 (1941):

> After the forces of conservatism and liberalism, of radicalism and reaction, of emotion and of self–interest are all caught up in the legislative process and averaged and come to rest in some compromise measure such as the Missouri Compromise, the N.R.A., the A.A.A., a minimum wage law, or some other legislative policy, a decision striking it down closes an area of compromise in which conflicts have actually, if only temporarily, been composed. Each such decision takes away from our democratic federalism another of its defenses against domestic disorder and violence.

No such conflicting interests were necessarily reflected in the regulations adopted by the DOT. No hearings were held prior to their adoption. There was no debate such as is typically involved in the legislative process. Moreover, no doors are closed to an area of compromise if regulations which are not racially neutral must be expressly authorized by Congress rather than by agency pronouncement.

■ This Court, construing the opinions in *Fullilove*, believes that these regulations, which without any Congressional command accord a preference to one group of citizens based on race and sex, are a denial of the equal protection accorded all Americans under the Constitution.

■ Prior decisions of the Supreme Court also support the view that a distinction must be made between Congressional and administrative action. A reading of relevant decisions by the Supreme Court reveals two related requirements that must be satisfied by an administrative agency seeking to establish a preferential classification of the type here challenged.

First, the agency must have been given authority by Congress to take such action. Second, the agency must have made findings of past discrimination and have determined that its actions are responsive to that discrimination. This Court is of the opinion that defendants in this action have failed to satisfy either requirement.

The requirement that the administrative agency be expressly empowered by Congress to impose such preferential classifications received expression not only in *Fullilove* but in several other recent decisions by the Court.

In *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), the Court reviewed a Civil Service Commission regulation excluding all non–United States citizens from employment in the federal civil service. Several resident aliens excluded by the regulation challenged the rule on due process and equal protection grounds. The regulation in question had not been enacted by Congress. The delegation by Congress of the authority to enact such a regulation was, however, far more explicit than the alleged grant of authority in the case now under consideration. Despite this more explicit delegation of authority, the Court found the challenged regulation violative of due process under the Fifth Amendment.

The Court noted at the outset of the majority opinion by Justice Stevens that there would have been a strong presumption in favor of the validity of the regulation had it been "expressly mandated by the Congress or the President," or if the agency

promulgating the rule had "direct responsibility for fostering or protecting" the interests allegedly protected by the rule. 426 U.S. at 103, 96 S.Ct. at 1905. For the purposes of its decision, the Court then assumed *arguendo* that Congress could, consistent with the due process requirements of the Fifth Amendment, exclude all non–citizens from federal service. Despite this assumption, the Court invalidated the regulation. The Court concluded that the interests which would support such action if taken by Congress could not support the same action if carried out by an administrative agency lacking an express Congressional mandate.

The much discussed decision of *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), afforded the Court another opportunity to discuss this requirement of express Congressional authorization. *Bakke* involved a challenge on equal protection grounds to a University of California preferential quota system operating in favor of four minority groups. Justice Powell concluded his opinion which announced the judgment of the Court as follows: "[I]solated segments of our vast governmental structures are not competent to make" decisions as to policies such as those implemented in *Bakke*, absent "legislative mandates" and "legislatively determined criteria." 438 U.S. 309, 98 S.Ct. 2758. Finally, Mr. Justice Powell affirmed the Court's previous recognition of "the special competence" of *Congress* "to make findings with respect to the effects of identified past discrimination" as well as "its discretionary authority to take appropriate remedial measures." 438 U.S. at 302 n.41, 98 S.Ct. at 2755 n.41.

Courts of appeal have struck down agency regulations which were not authorized by Congress on numerous occasions. For example, in *Romeo Community Schools v. HEW*, 600 F.2d 581 (6th Cir. 1979), the court invalidated HEW regulations because the court could not find that Title IX "was intended to cover employment practices." In *Junior College District v. Califano*, 597 F.2d 119 (8th Cir. 1979), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388, the court struck down HEW regulations because HEW did not have authority to promulgate regulations forbidding sex discrimination in employment. See also holding to same effect in *Islesboro School Comm. v. Califano*, 593 F.2d 424 (1st Cir. 1979).[1]

These decisions, along with the opinions reflecting the views of a majority of the Court in *Fullilove*, make a convincing case for the position that an administrative agency attempting to impose a race conscious remedy must have express Congressional authorization for such actions before those actions can be found consistent with the requirements of equal protection. Defendants here lack such an express Congressional mandate.

DOT's regulations cite the following six legislative acts as authority for the challenged MBE regulations:

1. Section 905 of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. § 803);

2. Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.);

3. Section 30 of the Airport and Airway Development Act of 1970;

4. The Urban Mass Transportation Act of 1964;

5. Title 23 of the U.S. Code (relating to federal highways); and

6. The Federal Property and Administrative Services Act of 1949 (40 U.S.C. § 471, et seq).

DOT is of course correct that these Acts reflect a national policy to halt discrimina-

---

1. In *Youngstown Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153, the seizure by Presidential order of the country's steel mills at a time when this nation was involved in the Korean war was challenged in the courts. The President's action was alleged to be justified to avert a national catastrophe which would result from a stoppage of steel production. The President urged that his order must be sustained from the aggregate of the President's powers including his power as Commander–in–Chief of the Armed Services. The Court struck down such Presidential action because it was not authorized by an Act of Congress.

tion based on race or sex, but they fall far short of authorizing DOT to promulgate the MBE regulations which are here challenged.

For example, § 905 of the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. § 803, provides, in part:

Sec. 905(a) General.–No person in the United States shall on the ground of race, color, national origin, or sex be excluded from participation in, or denied the benefits of, or be subjected to discrimination under, any project, program, or activity funded in whole or in part through financial assistance under this Act.

Plaintiffs are probably correct that DOT would require a clearer Congressional command for its MBE provision relating to its Highway Construction program than the Railroad Revitalization Act which in no way addresses itself to highways. But equally as important, nothing in the Railroad Revitalization Act confers on DOT the authority to further the statute's general anti–discrimination provisions by whatever means it deems efficacious. Nor does anything appear in the legislative history of the Act to indicate that Congress intended such a broad conferral of power when it enacted § 905. In their reliance on § 905 and the other five Acts of Congress, third party defendants have simply failed to offer sufficient evidence of the sort of "detailed legislative consideration" or conscious conferral of authority required by the decisions of the Supreme Court before an administrative agency can constitutionally impose the sort of race–conscious remedies now under consideration.

It can be argued that the general language against denying the benefits of the program to any person because of his race or sex is itself violated by the DOT regulations under consideration, which do award and deny benefits on the ground of race, color, national origin and sex. It seems clear that such language at least is not properly construed as Congressional authority to promulgate the regulations which are challenged here.

Defendants' reliance on Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d

et seq. is also misplaced. That Act provides in language almost identical with that in § 905 of the Railroad Revitalization and Regulatory Reform Act:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

Defendants' error in relying on § 905 applies with equal force here. In addition, defendants have failed to comply with the statutory requirements that must be met by an administrative agency seeking to enact a program pursuant to Title VI.

42 U.S.C. § 2000d–1 grants administrative agencies the authority to issue rules and regulations "consistent with achievement of the objectives of the statute authorizing the financial assistance." This section, however, expressly limits this authority by providing that "no such rule, regulation, or order shall become effective unless and until approved by the President." Pursuant to EO 11764, the authority to approve rules was delegated to the Attorney General. DOT concedes that the MBE regulation was never approved by the Attorney General. For this reason, defendants' reliance on Title VI seems doubly misplaced.

As already noted, a governmental agency seeking to impose a racial or sex–based system of preferences must also meet a second requirement before that system can be found consistent with the commands of equal protection. The governmental body must find past discrimination and make a determination that its proposed race or sex conscious program addresses that illegal discrimination. Thus, even if DOT should prevail on the question of whether it has the authority to issue this type of regulation, it must also show that it determined prior to the enactment of the regulation that discrimination against the minority groups favored under its rule had occurred and that the regulation in question was designed to eliminate the effects of that discrimination. Defendants in this case have failed to make such a showing.

The requirement that there be a finding of past discrimination has been set out and acknowledged in numerous cases. In *Bakke*, Justice Powell surveyed the decisions of the Supreme Court in this area and concluded flatly:

> We have *never* approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations. (citing cases) ... 438 U.S. at 307, 98 S.Ct. at 2757 (emphasis added)

In addition to this finding of past discrimination, there must also be a determination that the proposed race or sex–based classification is "responsive" to the identified discrimination. 438 U.S. at 309, 98 S.Ct. at 2758.

The record developed thus far in this case and the candid admissions of counsel for DOT indicated clearly that defendants did not engage in the sort of fact–finding process or responsible formulation of their MBE and WBE programs as required under the decisions of the Supreme Court. Furthermore, defendants have made no showing that they considered the desirability, appropriateness, or effectiveness of this particular program over that of other alternatives prior to the implementation of the challenged regulation.

### IRREPARABLE HARM

■ Plaintiffs are required to demonstrate that they are likely to suffer irreparable harm if the preliminary injunction is not granted. *Beacon Theaters v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1958). The alleged harm that these plaintiffs will suffer absent the issuance of a preliminary injunction is the deprivation of constitutionally protected rights of equal protection. The Court is of the opinion that these rights are so fundamental to our legal system and to our society that any violations thereof will cause irreparable harm irrespective of the financial impact. See, *A Quaker Action Group v. Hickel,* 421 F.2d

1111 (D.C. Cir. 1969); *Henry v. Greenville Airport Commissioner,* 284 F.2d 631 (4th Cir. 1960); *American Fed. of Gov. Employees, Loc. 1858 v. Callaway,* 398 F.Supp. 176 (N.D.Ala.1975); 11 Wright & Miller, *Federal Practice and Procedure* § 2948.

Though no further showing of injury may be required, third party plaintiff Alabama alleges that it too will be irreparably harmed should this Court fail to grant the requested preliminary relief. The threatened harm in this case is the forced compliance with an unconstitutional federal regulation. Such compliance will cause Alabama to expend an amount of State funds in excess of that which would be required absent the challenged regulation.

### THREATENED INJURY TO PLAINTIFFS OUTWEIGHS THE POTENTIAL HARM TO DEFENDANTS

■ Before granting a preliminary injunction, the Court must also determine whether the moving party would suffer greater harm from the denial of preliminary relief than the opposing party would suffer from a grant of the injunction. The balance of relative hardships in this case tips decidedly in favor of the moving party— particularly where, as here, the issues have been exhaustively briefed and argued.

Plaintiffs allege irreparable harm in the form of a deprivation of their equal protection rights under the Fifth and Fourteenth Amendments to the United States Constitution. The nature of this alleged injury is simply far graver and more important than any possible harm DOT might suffer from a delay in implementing the challenged regulation.

In addition, the State of Alabama alleges irreparable harm in the form of forced compliance with an unconstitutional federal statute. Specifically, the State will be required to let several irrevocable highway construction contracts for amounts in excess of that which would be required in the absence of the challenged DOT rule. The Court concludes that the threat of injury to Alabama under these circumstances is

greater than the harm DOT will suffer from a delay in implementing its proposed regulation.

### PUBLIC INTEREST

The final factor bearing on the Court's discretion to issue a preliminary injunction is the public interest. The Court recognizes that any decision will have an effect on different factions of the public sector. As DOT argued, issuance of an injunction may delay construction and increase costs. Nevertheless, in the opinion of this Court, the public interest in protecting an individual's Constitutional rights is superior to any adverse effect to the public claimed by DOT. Moreover, in view of the Court's opinion as to the likelihood of success, the public interest is better served if the challenged program is halted now.

An order will be entered in accordance with this opinion.