(No. 53511.—

S. N. NIELSEN COMPANY, Appellant, v. THE PUBLIC BUILDING COMMISSION OF CHICAGO *et al.,* Appellees.

*Opinion filed July 11, 1980.*

CLARK, UNDERWOOD and RYAN, JJ., dissenting.

O'Brien, Carey, McNamara, Scheuneman & Campbell, Ltd., of Chicago (Peter B. Carey, Tom Scheuneman, William J. Campbell, Jr., Peter Petrakis, and Timothy J. McGonegle, of counsel), for appellant.

William R. Quinlan, Corporation Counsel, of Chicago (Robert R. Retke and Maureen J. Kelly, Assistant Corporation Counsel, of counsel), for appellees Public Building Commission of Chicago and Brian M. Kilgallon.

Patrick W. O'Brien, Eugene E. Gozdecki, Gary T. Johnson, and C. Frederick LeBaron, of Mayer, Brown & Platt, of Chicago, for appellee Del E. Webb Corporation.

George L. Siegel, of Arvey, Hodes, Costello & Burman, of Chicago for *amicus curiae* Board of Trustees of Community College District No. 508.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

This action was filed by plaintiff, S. N. Nielsen Company, seeking a determination that it is entitled to the contract for the construction of the New Loop and City Wide College, to be located in downtown Chicago. The circuit court of Cook County agreed with plaintiff that the bidding formula used by the defendant Public Building Commission was unlawful, but it refused to grant the relief requested. We allowed plaintiff's motion for direct appeal. 73 Ill. 2d R. 302(b).

Plaintiff, S. N. Nielsen Company, and defendant Del E. Webb Corporation are general contractors in the construction industry. Both submitted bids in response to the defendant Public Building Commission's April 11, 1980, advertisement for bids for the construction of the New Loop and City Wide College, 30 E. Lake St., Chicago. On May 15, 1980, the Commission opened the bids of Nielsen, Webb, and five other bidders. Nielsen's bid of $19,130,000 was lowest, and Webb's bid of $19,320,000 was third lowest. By resolution of May 20, 1980, however, the Commission awarded the contract to Webb on the basis of its application of the Commission's so-called "canvassing formula" under which a bidder receives credits for the percentage of hours worked by minority members not in excess of 50% of the total hours worked on the project. These credits are subtracted from the contractor's bid, and the result is denominated the "award criteria figure." The formula is included in bidding documents distributed

to interested contractors, and the contractors calculate their own minority credits. The formula, as contained in the bidding documents, is set out below:

CANVASSING FORMULA

| | | |
|---|---|---|
| Line 1. | Base Bid, in figures | _____ |
| Line 2. | Percentage of the journeymen hours that the Contractor proposes to be worked by minority journeymen during construction of the project | _____ |
| Line 3. | Multiply line 2 by line 1 by 0.04 | _____ |
| Line 4. | Percentage of the total apprentice manhours that the Contractor proposes to be worked by minority apprentices during construction of the project | _____ |
| Line 5. | Multiply line 4 by line 1 by 0.03 | _____ |
| Line 6. | Percentage of the total laborer manhours that the Contractor proposes to be worked by minority laborers during construction of the project | _____ |
| Line 7. | Multiply line 6 by line 1 by .01 | _____ |
| Line 8. | Summation of lines 3, 5, and 7 | _____ |
| Line 9. | Subtract line 8 from line 1 = | _____ |
| | Award Criteria Figure | _____ |

The formula was taken verbatim from a form used by the city of Chicago. We also are informed that the Commission began using the formula as early as 1974 but that no resolution was passed formally adopting the formula. Nielsen, however, does not attack the Commission's failure to pass such a resolution and has stipulated that the case is not thereby affected in any manner.

After application of the formula, the bidder with the

lowest award criteria figure is awarded the contract. The award criteria figure, however, is used only to determine which contractor receives the contract; the contract is actually performed for the amount specified in the contractor's bid. Through application of the formula, it was determined that Webb had the lowest award criteria figure, $18,547,200, and that Nielsen had the second lowest such figure, $18,565,000. Webb was accordingly awarded the contract, to be performed at its bid price of $19,320,000, a figure $190,000 in excess of that specified by Nielsen.

That same day, May 20, Nielsen filed suit, alleging that the Commission's award to Webb violates the Commission's bidding statute. In its complaint, Nielsen sought declaratory and injunctive relief and a writ of *mandamus* directing the Commission to comply with its bidding statute and to award the contract to Nielsen. The bidding statute, section 20 of the Public Building Commission Act, provides in pertinent part that the Commission's contracts "shall be let to the lowest responsible bidder." (Ill. Rev. Stat. 1979, ch. 85, par. 1050.) Nielsen does not contend that the formula used by the Commission is arbitrary or that it unlawfully discriminates against non-minorities. Similarly, Nielsen does not contest the desirability of increased minority representation in public works projects.

On May 23, 1980, the circuit court entered a 10-day temporary restraining order, restraining the Commission and Webb from executing the awarded contract and from engaging in any construction thereunder. On May 30, the circuit court ruled that the Commission's use of the formula resulted in a conflict with its bidding statute, section 20 of the Public Building Commission Act, providing that contracts be awarded to the lowest responsible bidder. The court therefore held that use of the formula was unlawful. The court, however, dissolved its restraining order and denied Nielsen the requested declaratory and

injunctive relief and writ of *mandamus,* reasoning that Nielsen could sue at law for lost profits and that the rights of members of the public not before the court—the City College Board and minority members—might be adversely affected. This appeal by Nielsen followed, and the Commission cross-appealed from the circuit court's ruling that the Commission's use of the canvassing formula is unlawful.

Nielsen argues initially that the Public Building Commission, a creature of statute (Ill. Rev. Stat. 1979, ch. 85, par. 1031 *et seq.*), possesses only the authority granted therein (Ill. Const. 1970, art. VII, sec. 8). Citing cases from this and other jurisdictions, Nielsen argues that the Commission cannot, without legislative authority, implement its own notions of desirable public policy and thereby inject its minorities canvassing formula into its bidding process. (See, *e.g., Holden v. City of Alton* (1899), 179 Ill. 318; *Fullilove v. Beame* (1979), 48 N.Y.2d 376, 398 N.E.2d 765, 423 N.Y.S.2d 144.) The Commission and Webb argue in response that authorization for the formula is found in the affirmative action provisions of the Fair Employment Practices Act (Ill. Rev. Stat. 1979, ch. 48, par. 851 *et seq.*) and that a contractor's affirmative action efforts should be taken into account in determining whether that contractor is the "lowest *responsible* bidder" within the meaning of the Commission's bidding statute. We agree and accordingly reverse the circuit court's ruling that the formula is unlawful, and we affirm its decision not to disturb the award to Webb.

Section 3 of the Fair Employment Practices Act provides in pertinent part:

> "Unfair employment practices. It is an unfair employment practice:
>
> (a) For any employer, because of the race, color, religion, sex, national origin, ancestry or physical or mental handicap unrelated to ability of an individual, or an unfavorable discharge from military service, to refuse to hire,

to segregate, or otherwise to discriminate against such individual with respect to hire, selection and training for apprenticeship in any trade or craft, tenure, terms or conditions of employment ***." (Ill. Rev. Stat. 1979, ch. 48, par. 853(a).)

Section 4 of the Act, however, requires more and provides that a showing of affirmative action is a precondition to obtaining a public contract. That section provides:

"Public contracts. Every contract to which the State, any of its political subdivisions or any *municipal corporation* is a party shall be conditioned upon the requirement that the supplier of materials or services or the contractor and his subcontractors, and all labor organizations furnishing skilled, unskilled, and craft union skilled labor, or who may perform any such labor or services, as the case may be, shall not commit an unfair employment practice in this State as defined in this Act, and *shall take affirmative action to insure that no unfair employment practice is committed.*" (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 48, par. 854.)

The Public Building Commission, a municipal corporation (Ill. Rev. Stat. 1979, ch. 85, par. 1044), is clearly governed by section 4 and is thereby authorized to implement affirmative action requirements in the letting of its contracts "to *insure*" that no discrimination is practiced against minorities in employment decisions. (See *John N. Brunsfeld & Sons, Inc. v. Board of Education* (1977), 54 Ill. App. 3d 119, 123-25, and cases cited therein.) Though not in effect at the time of the bidding here in question, we also note that the new Illinois Human Rights Act, repealing the Fair Employment Practices Act and recodifying its affirmative action provisions effective July 1, 1980, similarly provides:

"Equal Employment Opportunities; Affirmative Action.

(A) Public Contracts. *Every party to a public contract shall:*

(1) Refrain from unlawful discrimination in employment and *undertake affirmative action to assure*

*equality of employment opportunity and eliminate the effects of past discrimination;*

(2) Comply with the procedures and requirements of the Department's regulations concerning equal employment and affirmative action;

(3) Provide such information, with respect to its employees and applicants for employment, and assistance as the Department may reasonably request." (Emphasis added.) Ill. Rev. Stat., 1979 Supp., ch. 68, par. 2—105(A)(1).

Nielsen disputes the interpretation of section 4 of the Fair Employment Practices Act set out above, suggesting instead that the section "merely requires contractors to refrain from active discriminatory hiring practices, nothing more." Such an interpretation, we believe, simply ignores the plain meaning of the section. "The obligation to take affirmative action imports more than the negative obligation not to discriminate." (*Southern Illinois Builders Association v. Ogilvie* (7th Cir. 1972), 471 F.2d 680, 684.) Nielsen's interpretation might indicate that there exists some disagreement as to the plain meaning of the section, but to the extent that the section may be considered ambiguous, it should be remembered that remedial legislation should be construed liberally to effectuate its purposes. *Zehender & Factor, Inc. v. Murphy* (1944), 386 Ill. 258, 263.

We also do not agree with plaintiff that the express mention of affirmative action programs in the bidding statute of the Metropolitan Sanitary District of Greater Chicago (Ill. Rev. Stat. 1979, ch. 42, par. 331.3) indicates the General Assembly's intention that the Public Building Commission not implement such a program. Our cases establish that this sort of "negative inference" is not one that we should draw, especially in light of a contrary expression of legislative intent such as that found in section 4 of the Fair Employment Practices Act. *Concrete Contractors' Association v. Village of La Grange Park* (1958), 14 Ill. 2d 65, 72.

Finally, Nielsen makes the argument that the Commission's canvassing formula must fall because its application results in the award of contracts to one other than the lowest responsible bidder. It is Nielsen's position that a contractor's commitment to affirmative action has nothing to do with whether it is responsible. The word "responsible" has previously been interpreted in the decisions of this State to mean financially responsible and able to discharge one's obligations "in accordance with what may be expected or demanded under the terms of the contract." (*People ex rel. Peterson v. Omen* (1919), 290 Ill. 59, 67. See also *Hallett v. City of Elgin* (1912), 254 Ill. 343, 346-47; *People ex rel. Assyrian Asphalt Co. v. Kent* (1896), 160 Ill. 655, 661-62.) We believe, however, that a contractor's commitment to affirmative action is something that "may be expected or demanded under the terms of the contract" within the meaning of the cases above cited. Antidiscrimination statutes such as section 4 of the Fair Employment Practices Act indicate the legislature's intention that, in public contracting, the *social* responsibility of the contractor should also be a concern. Financial responsibility and the ability to perform the contract are therefore not the only relevant factors, and the fact that a contractor submits the lowest bid will not automatically require that the contract be awarded to that contractor. As McQuillin states in his treatise on municipal corporations, "In proper circumstances a contract may be awarded to one who is not the lowest bidder, where this is done in the public interest, in the exercise of discretionary power granted under the laws, without fraud, unfair dealing, or favoritism, and where there is a sound and reasonable basis for the award as made." (10 E. McQuillin, Municipal Corporations sec. 29.73a, at 429-30 (3d ed. 1966).) Though none of the cases cited by McQuillin involve a contractor who obtained an award because of the operation of an affirmative action plan, we believe that

such a situation is within the intendment of the quoted passage. As one court has said, speaking of the Federal antidiscrimination and bidding statutes and those of its own State:

"It may be argued that requiring public contractors to take affirmative action to forestall discriminatory employment practices in the performance of their contracts will tend to raise the cost of such contracts. Increased costs impair another governmental interest, that of economy. It must be noted, however, that neither state nor federal contracts are secured only to the lowest bidder, but to the lowest *and best* bidder [citation] and lowest *responsible* bidder [citation]. Moreover, the alternative of securing a like degree of compliance with equal employment opportunity laws by means of public prosecutions and administrative proceedings is also costly and, in addition, is both *post hoc* and punitive. Indeed, it might reasonably be supposed that the governmental objectives of equal employment opportunity and low-cost public construction would be better served by requiring public contractors to undertake affirmative duties in practicing nondiscrimination in their dealings with and through others in the performance of the contract, thereby denying the benefits of public contract expenditures to those who would discriminate.

In addition to economics as a reason for requiring public contractors to assure nondiscriminatory performance, the strong moral commitment of both state and federal government to fair employment practices is reflected in their respective legislation. A government which has declared discriminatory employment practices unlawful should not then finance them indirectly by binding only its

direct contractor, and not the entire contract performance, to a promise of attempted compliance. We conclude that the capacity to assure a performance which complies with antidiscrimination laws is reasonably a part of the standard of a best or responsible bidder on a contract involving the expenditure of public funds. Accordingly, a bidder for a construction contract to be awarded by a public body of this state may be required to assure, by appropriate promises contained in contract provisions or related instruments, non-discrimination in employment in the entire performance of the contract." (Emphasis in original.) *Weiner v. Cuyahoga Community College District* (1969), 19 Ohio St. 2d 35, 38-39, 249 N.E.2d 907, 910, *cert. denied* (1970), 396 U.S. 1004, 24 L. Ed. 2d 495, 90 S. Ct. 554:

For the foregoing reasons, we hold that the circuit court erred in ruling that the minorities canvassing formula used by the Public Building Commission in awarding its contracts is unlawful. We further hold that the circuit court correctly refused to order that the contract for the construction of the New Loop and City Wide College be awarded to plaintiff, S. N. Nielsen Company.

*Affirmed in part and reversed in part.*

MR. JUSTICE CLARK, dissenting:

I must dissent because the result reached in this case is incorrect. While I certainly agree with the majority that a governmental agency may be empowered to implement affirmative action requirements (see, *e.g.*, *Fullilove v. Klutznick* (1980), 448 U.S. ——, 65 L. Ed. 2d 902, 100 S. Ct. 2758), the agency must do so in a proper and legally cognizable way. It cannot simply impose an *ad hoc* canvassing formula on public contractors without the

benefit of clear legislative authority and the formal adoption of a resolution by the agency. The majority has granted a governmental agency the unchecked power to set down arbitrary guidelines without need of direction from the legislature or publication by the agency. While I recognize that Nielsen did not raise the issue of the failure of the Commission to pass a resolution (81 Ill. 2d at 294), that does not prevent this court from inquiring into whether any authority existed for the Commission to act.

Recently this court decided *Craddock v. Board of Education* (1980), 81 Ill. 2d 28. In that case a teacher was suspended by a school board because he cursed at a student. The school board argued that it derived its authority to suspend the teacher from the rulemaking authority granted to school boards in section 10—20.5 of the School Code (Ill. Rev. Stat. 1975, ch. 122, par. 10—20.5). The school board never adopted any such rule, however. We stated in *Craddock* that since the school board did not exercise its rulemaking authority to adopt a rule suspending teachers for specified infractions, it lacked the authority to suspend the teacher. (81 Ill. 2d 28, 31.) The same principle applies here. An agency cannot excuse its *ad hoc* actions by stating that it could have passed a rule, resolution or regulation prospectively authorizing the particular action. To do so opens the way for any number of *ex post facto* acts by governmental agencies, a prospect that is ominous to say the least. Such a prospect was repudiated in *Craddock*, yet it has gained acceptance by the majority in the instant case.

Furthermore, one need only look to the United States Supreme Court's recent decision in *Fullilove v. Klutznick* to observe the invalidity of the Commission's action in this case. At issue in *Fullilove* was the constitutional and statutory validity of section 103(f)(2) of the Public Works Employment Act of 1977 (42 U.S.C. sec. 6705(f)(2) (1977 Supp. I)). That section provides:

"Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term 'minority business enterprise' means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts." (Public Works Employment Act sec. 103(f)(2), (42 U.S.C. sec. 6705(f)(2) (1977 Supp I).)

As required by the Public Works Employment Act of 1977, the Secretary of Commerce promulgated extensive regulations. (13 C.F.R. part 317 (1978).) "Where competitive bidding is employed, the regulations echo the statute's requirement that contracts are to be awarded on the basis of the 'lowest responsive bid submitted by a bidder meeting established criteria of responsibility,' and they also restate the MBE [minority business enterprise] requirement." (448 U.S. ———, ———, 65 L. Ed. 2d 902, 918, 100 S. Ct. 2758, 2769-70.) (I note parenthetically that a responsive bid is different from a responsible bid. Responsive, presumably, means in accord with the minority business enterprise requirements contained in the applicable regulations; the meaning of responsible as construed in this State will be hereinafter discussed.) The court, in upholding the validity of section 103(f)(2) of the 1977 act, noted that the regulations provided that the lowest responsive bid requirement could be waived where minority business enterprises submitted a bid which was higher than other bids, but where the higher bid was attributable "to the minority firm's attempt to cover costs inflated by the present effects of disadvantage or discrimina-

tion." (448 U.S. ——, ——, 65 L. Ed. 2d 902, 919, 100 S. Ct. 2758, 2771.) Only then was the court satisfied that the legislative authority, accompanied by "administrative scrutiny" and "surveillance" of the minority business contracting program, was lawful and constitutional. 448 U.S. ——, ——, 65 L. Ed. 2d 902, 930-31, 100 S. Ct. 2758, 2779-80.

While no constitutional issues were raised in this case, I think *Fullilove* is supportive of the general proposition that a governmental agency must act within clearly established and narrowly defined administrative bounds where imposing contracting conditions based on race. As the court stated in *Fullilove*:

> "The history of governmental tolerance of practices using racial or ethnic criteria for the purpose or with the effect of imposing an invidious discrimination must alert us to the deleterious effects of even benign racial or ethnic classifications when they stray from narrow remedial justifications. Even in the context of a facial challenge such as is presented in this case, the MBE provision cannot pass muster unless, with due account for its administrative program, it provides a reasonable assurance that application of racial or ethnic criteria will be limited to accomplishing the remedial objectives of Congress and that misapplications of the program will be promptly and adequately remedied administratively." (448 U.S. ——, ——, 65 L. Ed. 2d 902, 929-30, 100 S. Ct. 2758, 2779.)

Since the formula herein is imposed on an *ad hoc* basis, without any administrative guidelines, standards or restrictions, I dissent from the majority's blanket approbation of it.

A second flaw in the majority opinion is that it reads section 20 of the Public Building Commission Act (Ill.

Rev. Stat. 1979, ch. 85, par. 1050) and section 4 of the Fair Employment Practices Act (Ill. Rev. Stat. 1979, ch. 48, par. 854) *in pari materia* based solely on the majority's vision of social betterment. What is ignored by the majority is that the two statutes involved deal with different but equally important and valuable goals, as enunciated by the General Assembly. It is beyond the purview of this court to decide that one statute is more valuable than the other. Yet that is precisely what has occurred here. Section 20 requires that a party who receives a contract must have submitted the lowest bid during competitive bidding and that the party must be financially capable of performing its obligations under the contract. Two important legislative goals are thereby furthered: first, public revenues · are not squandered; and second the State obtains reasonable assurance that it will not need to sue the contractor for the breach of its duty to perform under the contract. As the majority points out, these laudable goals are well entrenched in our law. (See *People ex rel. Peterson v. Omen* (1919), 290 Ill. 59; *Hallett v. City of Elgin* (1912), 254 Ill. 343; *People ex rel. Assyrian Asphalt Co. v. Kent* (1896), 160 Ill. 655.) For some inexplicable reason, however, the majority has now added the vague requirement to section 20 that a bidder be "socially" responsible, and has thus, in one fell swoop, erased 84 years of law in this State. What bewilders me is why this drastic action was necessary. The clear import of section 4 of the Fair Employment Practices Act requires that any person who contracts with the State or any of its political subdivisions or any municipal corporation "take affirmative action to insure that no unfair employment practice is committed." (Ill. Rev. Stat. 1979, ch. 48, par. 854). Therefore, the valuable goal sought to be furthered by the legislature of encouraging minority representation in companies which obtain public contracts is clearly provided for in section 4. There is no need to

superimpose that requirement on section 20 of the Public Building Commission Act.

Another serious discrepancy in this case is that the majority relies on the new Illinois Human Rights Act, which the majority concedes was not in effect when this case arose. It should be emphasized that the significant addition to existing law is the following excerpt from the new act:

> "(A) Public Contracts. Every party to a public contract shall:
>
> ***
>
> (2) Comply with the procedures and requirements of the Department's regulations concerning equal employment and affirmative action; ***." (Ill. Rev. Stat., 1979 Supp., ch. 68, par. 2—105(A)(2).)

The new act obviously contemplates the adoption of regulations governing the letting of public contracts, an essential requirement apparently overlooked by the Commission and the majority. Thus, it is a source of amazement to me that the majority could approve the instant program which operates without any regulations.

The approach which is most consistent with both existing law and logic is for the Commission, first, to establish which is the lowest responsible bid. Section 20 is mandatory in its terms and may be objectively applied. Either a contractor submits the lowest bid and establishes financial solvency or he does not. No discretion need be involved. Next, the Commission may decide, by means of formally adopted, published standards, a range of acceptable levels of minority representation. These standards could, as in *Fullilove v. Klutznick* (1980), 448 U.S. ——, ——, 65 L. Ed. 2d 902, 919, 100 S. Ct. 2758, 2771, take into account exceptional circumstances warranting more or less minority representation, waivers, exemptions and so forth. The point is that first the lowest-responsible-bidder requirement must be met and then the precondition of assuring that the employer-contractor had undertaken

affirmative action must be fulfilled. In that way, both statutes will be followed and all of the pertinent legislative goals will be furthered, instead of one statute being followed to the neglect or misinterpretation of another.

Applying the foregoing approach, Nielsen should have received the contract in the instant case. Nielsen submitted the lowest bid; Nielsen's affirmative action plan proposed that 35% of its apprentices and journeymen would be minority members, whereas 50% of its laborers would be minority workers. Webb proposed that 50% of its apprentices, journeymen and laborers would be minority members. Thus, it could hardly be said that Nielsen's bid was unfair, or that it differed greatly from Webb's. Also, there is no indication and no claim has been made by Webb but that Nielsen was in full compliance with section 4 of the Fair Employment Practices Act. Thus, Nielsen was the only bidder which complied with *all* of the statutory requirements. Therefore, Nielsen has been erroneously deprived of the contract.

In conclusion, the majority has approved the unguided use of power of a governmental agency in violation of one of our own decisions and the Supreme Court's decision in *Fullilove v. Klutznick.* Furthermore, the majority has, by a strained interpretation, altered the meaning of section 20 of the Public Building Commission Act. The end result is that a party which met *all* the statutory requirements has been denied a public contract while a party which met only one requirement has received the contract. I believe this decision is a departure from sound judicial interpretation and an exercise in legislating which is wholly unwarranted. I therefore dissent.

UNDERWOOD and RYAN, JJ., join in this dissent.