[No. 48975–1. En Banc. July 28, 1983.]

SOUTHWEST WASHINGTON CHAPTER, NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, ET AL, *Appellants,* v. PIERCE COUNTY, *Respondent.*

110

*James V. Handmacher* (of *Bonneville, Viert, Morton & McGoldrick*), for appellants.

*William H. Griffies, Prosecuting Attorney,* and *Kathryn B. Gerhardt, Deputy,* for respondent.

UTTER, J.—In this case, appellants challenge an affirmative action plan for minority and women's business enterprises in public works contracting, claiming violations of statutory competitive bidding provisions and both the federal and state constitutions. We hold that the challenged plan violates neither constitutional nor statutory provisions and therefore affirm the trial court.

On January 5, 1982, the Pierce County Council passed ordinance 81–121 which adopted an affirmative action plan applicable to county public works contracts. In its preamble, the ordinance recognized the underrepresentation of minorities and women in the county work force and declared an intention to take affirmative action to correct the problem. As one such effort, the accompanying affirmative action plan required all contractors to affirmatively seek minority subcontractors. It concluded that reasonable opportunities exist for minority business enterprise participation, and that "at least *12* percent of the total contract amount is a reasonable goal". Plaintiff's exhibit 4, at 12. No specific goal was set in the plan for women.

In setting the 12 percent goal, the affirmative action plan noted that the goal was based on numerous conferences with government officials, minority businessmen and contractors, as well as a review of requirements in other public works contracts and of applicable federal, state and local law. County officials also met with interested parties on numerous occasions prior to passage of a comparable affirmative action ordinance in 1977, as is evidenced in the record by a letter from appellant Associated General Contractors, a letter from the county contract compliance offi-

cer, and an affidavit of the county affirmative action officer.

On January 8, 1982, the County solicited bids for construction of a new Detention and Correction Center. Bidders were required to certify in their bids the amount of work they intended to subcontract to minority business enterprises (MBE's) and women's business enterprises (WBE's), respectively. In addition, bidders were required to "make every effort" to meet affirmative action subcontracting goals of $1,685,000 for MBE's and $153,500 for WBE's. These figures were approximately 11 and 1 percent, respectively, of the total budgeted for the project.

Compliance with the MBE and WBE subcontracting goals was incorporated into the selection process by the following provision in the bid specifications.

> The successful bidder shall be selected on the basis of his having submitted the lowest responsive bid which has met the MBE and/or WBE goal(s) as established elsewhere in these contract documents. Should the low and otherwise responsive bidder fail to attain the goal(s), responsiveness shall be determined on the basis of good faith efforts taken to attain the goal(s). The County has established the following objective measurement of good faith. Good faith shall be determined in light of the MBE and/or WBE participation attained by all bidders and by comparing the MBE and/or WBE participants of the low bidder with the average MBE and/or WBE participation by all bidders. Should the low bidder's MBE and/or WBE participation be lower than the average(s) in each category, the bid shall be considered unresponsive and shall be rejected. If the lowest bid is rejected, the next lowest bid, or bids, shall be examined under the foregoing criteria until the contract is awarded or all bids rejected.

Plaintiff's exhibit 6, at SC–4, SC–5. "Minority" was defined to include blacks, Hispanics, Asian Americans, native North Americans, and any other group or individual "found to be economically and socially disadvantaged by the Small Business Act, as amended (15 U.S.C. 637(a))." Plaintiff's exhibit 6, at SC–3. MBE or WBE status was defined to require (1) at least 51 percent ownership and (2) full control of management and daily business operations by

minorities or women, respectively.

The County opened bids on February 16, 1982, and discovered that only one bidder had met the affirmative action goals or the test for good faith efforts. Since the one bidder in compliance was over budget and it appeared to County officials that the other bidders had misunderstood the affirmative action requirements, all bids were rejected. In addition to correcting some problems it had discovered in the physical specifications, the County clarified the affirmative action requirements. The revised specifications also provided that if all bids within budget satisfied neither the affirmative action goals nor the good faith test and if the State Jail Commission, which was funding the project, consented, the low bidder would be given an opportunity to amend its proposal to include subcontract awards to MBE's and WBE's at least equal to the average of that certified by all bidders.

After making these changes, the County called for new bids, which were opened on March 23, 1982. All bidders in this round satisfied the affirmative action goals, but the low bidder differed. Upon award of the contract to this low bidder, this action was instituted by Commercial Electric, Inc., a subcontractor of the low bidder in the first round of bids, and local chapters of the National Electrical Contractors Association and Associated General Contractors of America, two associations whose members regularly bid for County public works contracts. The plaintiffs originally sought damages and/or injunctive relief regarding the jail project, but they soon dropped those claims and now seek only declaratory relief regarding future County projects. The amended complaint does, however, allege that the affirmative action requirements for the jail project are typical of those used in other projects and the County does not deny this allegation. The present action therefore presents a sufficient justiciable controversy for purposes of the Uniform Declaratory Judgments Act, RCW 7.24. *Cf. Clallam Cy. Deputy Sheriff's Guild v. Board of Clallam Cy. Comm'rs,* 92 Wn.2d 844, 848–49, 601 P.2d 943 (1979) (ordi-

nance which made legal rights and obligations uncertain created justiciable controversy).

The trial court ruled against appellants and they petitioned for direct review by this court, which we granted. Appellants contend that the County's affirmative action plan (1) violates the state competitive bidding statute; (2) violates the equal protection clause of the Fourteenth Amendment of the federal constitution; and (3) violates the privileges and immunities clause (Const. art. 1, § 12) and equal rights amendment (Const. art. 31) of our state constitution.

I

COMPETITIVE BIDDING REQUIREMENTS

With certain exceptions not pertinent here, RCW 36.32-.250 requires that all public works contracts be awarded by competitive bidding. Selection among bidders is to be as follows:

> The contract for the public work, lease or purchase shall be awarded to the lowest responsible bidder; taking into consideration the quality of the articles or equipment to be purchased or leased. Any or all bids may be rejected for good cause.

RCW 36.32.250. Appellants contend that failure to meet affirmative action goals neither permits the County to consider a bidder not "responsible" nor constitutes "good cause" for rejecting a bid. Instead, appellants argue, the scope of these terms must be limited to factors affecting quality or completion of the work.

The exact scope of the terms "responsible" and "good cause" is unclear. The latter term has been generally defined as "reasonable under the law". *Butler v. Federal Way Sch. Dist. 210,* 17 Wn. App. 288, 295, 562 P.2d 271 (1977). The former has been construed as prohibiting preferences for state residents (*see Reiner v. Clarke Cy.,* 137 Wash. 194, 201, 241 P. 973 (1926));[1] however, we view that

---

[1]The statute at issue in *Reiner* contained no "good cause" provision. *See* Rem. Comp. Stat. § 6408, *quoted in Reiner,* at 198.

interest as significantly less compelling than the State's interest in eliminating the effects of past discrimination. *Compare Laborers Local 374 v. Felton Constr. Co.*, 98 Wn.2d 121, 654 P.2d 67 (1982) (state interest in residents' employment did not justify requirement that public works contractors employ 95 percent state residents) *with Schmidt v. Oakland Unified Sch. Dist.*, 662 F.2d 550, 557–58 (9th Cir. 1981) (state interest in ameliorating effects of past discrimination justified racial classification), *vacated on other grounds*, 457 U.S. 594, 73 L. Ed. 2d 245, 102 S. Ct. 2612 (1982).

Authorities outside this state are divided in their interpretation of comparable language in the statutes of other states. McQuillin takes the view that an agency may reject a low bid where "in the public interest" and includes within this compliance with affirmative action goals. 10 E. McQuillin, *Municipal Corporations* § 29.73a (3d ed. 1981). *See also M.C. West, Inc. v. Lewis*, 522 F. Supp. 338, 341 (M.D. Tenn. 1981); *Central Ala. Paving, Inc. v. James*, 499 F. Supp. 629, 633 (M.D. Ala. 1980); *S.N. Nielsen Co. v. Public Bldg. Comm'n*, 81 Ill. 2d 290, 299, 410 N.E.2d 40 (1980); *Weiner v. Cuyahoga Comm'ty College Dist.*, 19 Ohio St. 2d 35, 39, 249 N.E.2d 907 (1969), *cert. denied*, 396 U.S. 1004 (1970). Other courts have construed terms such as "responsible" and "good cause" as limited to considerations directly connected with quality. *See Owen, Inc. v. Shelby Cy.*, 648 F.2d 1084, 1092 (6th Cir. 1981) (applying Tennessee law); *Associated Gen. Contractors v. San Francisco Unified Sch. Dist.*, 616 F.2d 1381, 1385 (9th Cir.), *cert. denied*, 449 U.S. 1061 (1980) (applying California law); *Arrington v. Associated Gen. Contractors*, 403 So. 2d 893, 899 (Ala. 1981), *cert. denied*, 455 U.S. 913 (1982).

We consider the former view the better one. We find in the word "responsible" a legislative intent that "the *social* responsibility of the contractor should also be a concern." *S.N. Nielsen Co. v. Public Bldg. Comm'n, supra* at 299. Similarly, we believe "good cause" was intended to encompass considerations other than those directly con-

nected with work quality when those reasons are sufficiently compelling. *Cf. In re Bale,* 63 Wn.2d 83, 89, 385 P.2d 545 (1963) ("good cause" for quitting job under unemployment compensation statute includes "compelling personal reasons" as well as causes directly connected to the job).

This more liberal construction is also more in accord with the purpose underlying the competitive bidding statute. That purpose is twofold: (1) Protection of the general public from fraud, collusion, and favoritism; and (2) provision of a fair forum for those interested in bidding on public contracts. *Gostovich v. West Richland,* 75 Wn.2d 583, 587, 452 P.2d 737 (1969). Permitting rejection of bids due to failure to meet published affirmative action requirements presents no danger of fraud, collusion, or favoritism and in fact advances the broader public interest by alleviating the effects of past discrimination. Affirmative action requirements further the second purpose of competitive bidding in its broader sense, by providing a fairer forum for subcontractors disadvantaged by the effects of past discrimination.

Appellants' contention that the rule of ejusdem generis requires that "responsible" and "good cause" be construed to encompass only factors such as "quality" (*see* RCW 36.32.250) is not well taken. That rule of construction requires that general words accompanied by specific words are to be construed to embrace only similar objects. *See, e.g., State v. Stockton,* 97 Wn.2d 528, 532, 647 P.2d 21 (1982). While the rule was applied to a similar statute in *Owen, Inc. v. Shelby Cy., supra* at 1092, we do not find that court's reasoning persuasive, at least as applied to our statute. The ejusdem generis rule is generally applied to general and specific words clearly associated in the same sentence in a pattern such as "[specific], [specific], or [general]" or "[general], including [specific] and [specific]". *See, e.g., State v. Stockton, supra* at 530; *State v. Reader's Digest Ass'n,* 81 Wn.2d 259, 279, 501 P.2d 290 (1972), *appeal dismissed,* 411 U.S. 945 (1973); *Dean v. McFarland,* 81 Wn.2d 215, 221, 500 P.2d 1244 (1972). Where the general

and specific words are not so connected, the reasoning underlying the ejusdem generis rule loses its force.

## II
### FEDERAL CONSTITUTIONAL LIMITATIONS

Appellants' central assertion is that the County's affirmative action plan violates the equal protection clause of the Fourteenth Amendment to the federal constitution. The most recent Supreme Court decision in the affirmative action area, which also dealt with minority subcontracting participation goals, is *Fullilove v. Klutznick,* 448 U.S. 448, 65 L. Ed. 2d 902, 100 S. Ct. 2758 (1980).

### A
#### *Fullilove v. Klutznick*

In *Fullilove,* the Court upheld a federal law which, absent an administrative waiver, required recipients of federal grants for local public works projects to subcontract at least 10 percent of the work to minority business. Unfortunately, the Court was badly split, with three of the six Justices in the majority writing separate opinions, no one of which was signed by more than three Justices. Full distillation of the implications of *Fullilove* therefore requires a somewhat extended analysis.

The controlling opinion was that of Chief Justice Burger. Justice Marshall, writing for himself and two other Justices, concluded that affirmative action programs were subject to only an "intermediate" level of scrutiny and that the program at issue in *Fullilove* clearly satisfied this test. *See Fullilove,* at 519 (Marshall, J., concurring in the judgment). *See also Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 324, 57 L. Ed. 2d 750, 98 S. Ct. 2733 (1978) (Marshall, J., dissenting) (applying identical test). Chief Justice Burger, on the other hand, in an opinion signed by Justices White and Powell, found the question much closer (*see Fullilove,* at 490) and his opinion is therefore the one which must be looked to in ascertaining the bounds of permissible affirmative action. The concurring opinion of Justice Powell provides some guidance in interpreting Chief Justice Burger's

opinion, since Justice Powell did sign it, but is not controlling because Justice Powell was not a necessary member of the majority.

### Chief Justice Burger's Plurality Opinion

Chief Justice Burger did not frame his test in terms of any of the equal protection standards recognized in other contexts. While noting at several points that a remedial racial classification requires "close examination" (*Fullilove,* at 472, 480, 491), he did not describe his test in terms of either of the traditional "strict scrutiny" and "rational relationship" standards or the more innovative "intermediate scrutiny" standard advocated by Justice Marshall and recently recognized by a majority of the Court in *Plyler v. Doe,* 457 U.S. 202, 217–18, 72 L. Ed. 2d 786, 102 S. Ct. 2382, 2395 (1982). Indeed, Chief Justice Burger expressly disclaimed any intent to adopt, "either expressly or implicitly, the formulas of analysis articulated in such cases as *University of California Regents v. Bakke, [supra]." Fullilove,* at 492.

Whatever its appropriate label, Chief Justice Burger applied a 2–step analysis. First, he inquired into whether the *objective* of the law was within congressional authority, and, second, he inquired into the constitutional validity of the *means* selected. An extended analysis of the law's legislative history demonstrated that its objective was to prevent perpetuation of the effects of past discrimination. *Fullilove,* at 473.

Having identified the law's objective, Chief Justice Burger then concluded, on two grounds, that it was within congressional authority. The power to regulate the subcontracting practices of nongovernmental grantees he found in the commerce clause—because the legislative history evidenced a "rational basis" for concluding present practices might perpetuate past discrimination, Congress could act to remedy the situation. *Fullilove,* at 475–76 (citing *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 13 L. Ed. 2d 258, 85 S. Ct. 348 (1964)). To justify regulation of

state and local governmental grantees, however, Chief Justice Burger turned to Congress' enforcement power under the Fourteenth Amendment, for the scope of the commerce power's application to governmental entities is limited. *Fullilove,* at 476 (citing *National League of Cities v. Usery,* 426 U.S. 833, 49 L. Ed. 2d 245, 96 S. Ct. 2465 (1976)). Regulation of state practices is authorized by the Fourteenth Amendment enforcement power as long as one can "perceive a basis upon which Congress could reasonably predicate a judgment" that the state practices are perpetuating the effects of past discrimination. *Fullilove,* at 477 (citing *Katzenbach v. Morgan,* 384 U.S. 641, 16 L. Ed. 2d 828, 86 S. Ct. 1717 (1966)). Once again the legislative history provided "abundant evidence". *Fullilove,* at 477–78.

Having concluded that the law's *objective* was within congressional power, Chief Justice Burger then turned to the validity of the *means* selected to further that objective. In doing so, he did note that "any congressional program that employs racial or ethnic criteria to accomplish the objective of remedying the present effects of past discrimination [must be] narrowly tailored to the achievement of that goal." *Fullilove,* at 480. However, he rejected the contention that Congress and the states must act in a wholly "color–blind" fashion. *Fullilove,* at 482–83. The authority to declare discriminatory conduct unlawful necessarily includes the authority to induce action to prevent and counter such conduct. *Fullilove,* at 484.

Chief Justice Burger found the law in *Fullilove* sufficiently "narrowly tailored". He noted that the burden placed on nonminority firms was relatively light (*Fullilove,* at 484) and strongly emphasized the administrative provisions for consideration of waiver and exemption requests on a case–by–case basis (*Fullilove,* at 487–89). These provisions assured that the law "will be limited to accomplishing the remedial objectives contemplated by Congress and that misapplications of the racial and ethnic criteria can be remedied." *Fullilove,* at 489.

*Justice Powell's Concurring Opinion*

Justice Powell signed the plurality opinion because he found it "substantially in accord with [his] own views" but also wrote separately "to apply the analysis set forth by [his] opinion in [*Bakke*]." *Fullilove,* at 496 (Powell, J., concurring). He set out a 3–part test. First, there must be authority to act in response to identified discrimination. Second, there must be findings which demonstrate the existence of past discrimination. Third, a race–conscious remedy "must be narrowly drawn to fulfill the governmental purpose." *Fullilove,* at 498.

Justice Powell found his test to be satisfied in *Fullilove.* As did Chief Justice Burger, Justice Powell pointed to the commerce clause and Congress' enforcement power under the Thirteenth, Fourteenth and Fifteenth Amendments as the basis for congressional authority. *Fullilove,* at 499–502. Justice Powell, however, drew no distinction between the authority to regulate private entities and the authority to regulate state and local government. He also emphasized to a greater extent the "unique constitutional role" of Congress. *Fullilove,* at 516.

Justice Powell's emphasis on findings also appears to differ from that of Chief Justice Burger. Justice Powell explicitly rejected the "perceive a basis" standard recognized by Chief Justice Burger and required findings that would "satisf[y] fairminded people that the congressional action is just." *Fullilove,* at 503 n.4, 507 n.8. Justice Powell also noted that "[t]he degree of specificity required in the findings of discrimination . . . may vary with the nature and authority of a governmental body." *Fullilove,* at 515 n.14. Nonetheless, Justice Powell conceded that congressional "findings" need not be as formal as those of judicial and administrative bodies and that Congress could rely upon information considered in the enactment of prior legislation. *Fullilove,* at 502–03. In *Fullilove,* he found the findings sufficient. *Fullilove,* at 506.

The third aspect of Justice Powell's test, that the means for ameliorating the effects of past discrimination be nar-

rowly drawn to accomplish that purpose, tracks the means prong of Chief Justice Burger's test. Justice Powell, however, went further to suggest five particular factors to be considered: (1) The efficacy of alternative remedies; (2) the planned duration of the remedy; (3) the relationship between the percentage set–aside and the percentage of minority workers in the relevant population or work force; (4) the availability of a waiver where goals cannot be met; and (5) the effect of the set–aside on innocent third parties. *Fullilove,* at 510–11, 514. Applying these factors, Justice Powell found the plan in *Fullilove* sufficiently narrow.

### Implications and Analysis

Out of these opinions we distill three requirements which an affirmative action plan must meet under the equal protection clause. While these requirements track Justice Powell's opinion in nature, they do not necessarily do so in content. In light of Chief Justice Burger's express rejection of all of the approaches advocated in *Bakke* and the other differences between his and Justice Powell's analysis, Justice Powell's opinion cannot be considered fully representative of the views of a majority of the Court.

██ The first requirement is that the governmental body requiring affirmative action have authority to address the problems brought about by racial discrimination. Justice Powell's opinion can be read as creating a unique authority in Congress alone. Note, *The Constitutionality of Affirmative Action in Public Employment: Judicial Deference to Certain Politically Responsive Bodies,* 67 Va. L. Rev. 1235, 1244 (1981) (hereinafter Va. Note). *But see South Fla. Chapter of Associated Gen. Contractors v. Metropolitan Dade Cy.,* 552 F. Supp. 909, 934 (S.D. Fla. 1982) (construing Justice Powell's opinion to place limits solely on nonlegislative bodies). The reasoning of Chief Justice Burger, however, requires that comparable authority be recognized in state government as well, for in finding congressional authority to regulate *private* grantees he relied solely on the commerce clause. Congress' regulatory

power over interstate commerce is comparable in scope to the general police power of the states. *Heart of Atlanta Motel, Inc. v. United States, supra* at 260. Chief Justice Burger's conclusion that the commerce clause empowers Congress to act to eliminate the effects of past discrimination therefore necessarily requires a conclusion that the states may take similar action pursuant to their police power. State legislatures and any lower body to which authority has been clearly delegated thus have the authority to undertake otherwise permissible affirmative action. *See Dade Cy.*, at 934; Va. Note, at 1245–48; *compare Central Ala. Paving, Inc. v. James,* 499 F. Supp. 629, 636 (M.D. Ala. 1980) (Department of Transportation regulations not expressly authorized by Congress) *with M.C. West, Inc. v. Lewis,* 522 F. Supp. 338, 346–47 (M.D. Tenn. 1981) (criticizing *Central Alabama Paving* and finding Department of Transportation regulations authorized by Congress).

The second requirement which an affirmative action plan must meet is that it be supported by findings that the effects of past discrimination are being perpetuated. Only minimal findings are required, however, for they need only be sufficient to provide a "rational basis" for the conclusion that present practices could perpetuate past discrimination. *Accord,* Note, *The Supreme Court, 1979 Term,* 94 Harv. L. Rev. 75, 132 (1980). To the extent that Justice Powell would require more, we do not believe he represents a majority of the Court. *Accord, Schmidt v. Oakland Unified Sch. Dist.,* 662 F.2d 550, 558 (9th Cir. 1981), *vacated on other grounds,* 457 U.S. 594, 73 L. Ed. 2d 245, 102 S. Ct. 2612 (1982).

The final requirement which an affirmative action plan must meet is that it be "narrowly tailored". It must sweep no more broadly than necessary to counter the problem upon which its justification rests and must be flexible enough to adjust on a case–by–case basis. While not necessary components of an affirmative action plan, the specific factors enumerated by Justice Powell provide guidance for evaluation. Of greatest importance is that the plan make

some provision for waiver of affirmative action require-
ments in appropriate cases.

## B
### THE PIERCE COUNTY PLAN

The affirmative action plan in the present case satisfies
each of the three requirements just set forth.

First, Pierce County has authority to address the prob-
lem of the continuing effects of past discrimination. As
noted above, state legislatures have authority equally as
broad as that of Congress in this area. Pierce County, hav-
ing enacted a home rule charter (*see* Pierce County Char-
ter, art. 1, § 1.10), has powers as broad as the State, except
where expressly limited. *King Cy. Coun. v. Public Disclo-
sure Comm'n,* 93 Wn.2d 559, 562–63, 611 P.2d 1227 (1980).
The Pierce County Council therefore has the same author-
ity as the Legislature to deal with the effects of past dis-
crimination. *Cf. Arrington v. Associated Gen. Contractors,*
403 So. 2d 893, 902 (Ala. 1981), *cert. denied,* 455 U.S. 913
(1982) ("limited police power" granted to city by state did
not include power to grant racially discriminatory prefer-
ences).

There is also satisfactory evidence of findings of past
discrimination here. While the County Council has not pre-
served records of its debates and meetings as Congress reg-
ularly does, several documents attest to numerous meetings
and conferences with interested parties.[2] See page 111. In
addition, the preamble of the ordinance expressly recog-
nizes the underrepresentation of minorities and women in
the county work force. Finally, the County Council was
entitled to rely to at least some extent on the more general
national and statewide findings underlying existing federal
and state law. *See, e.g.,* Executive Order 80–03, at 1 (noting
discriminatory practices to which both MBE's and WBE's

---

[2]Appellants' suggestion that the County must produce records of these meet-
ings is ill advised. Local legislative bodies, which necessarily operate on a smaller
and more informal scale, cannot be expected to undertake the expense of detailed
recordkeeping comparable to that of Congress, which operates on a national scale.

have been subjected). This record compares favorably to that which other courts have found sufficient, even under the stricter requirements advocated by Justice Powell. *See Schmidt v. Oakland Unified Sch. Dist., supra* at 558–59 (findings in text of law after numerous meetings and public hearings); *M.C. West, Inc. v. Lewis, supra* at 347 (agency notice and comment procedures sufficient); *cf. Arrington v. Associated Gen. Contractors, supra* at 902 (conclusory legislative preamble alone insufficient). The County Council certainly had a "rational basis" for concluding that present practices were perpetuating the effects of past discrimination.

The County's affirmative action plan is also narrowly drawn. While the plan lacks a definite expiration date, this is not dispositive. *See South Fla. Chapter of Associated Gen. Contractors v. Metropolitan Dade Cy., supra* at 939. The ordinance does provide for annual review and revision. See plaintiff's exhibit 4, at 2. Moreover, each of the other factors specified by Justice Powell weighs in favor of the County's plan. No especially efficacious alternative remedies appear available. *See Dade Cy.,* at 939 (no readily available alternatives to numerical goal). The burden on nonminority male dominated firms is relatively light, as they may still compete for 88 percent of the subcontracting business. *See Fullilove v. Klutznick,* 448 U.S. 448, 514–15, 65 L. Ed. 2d 902, 100 S. Ct. 2758 (1980) (noting relatively minor impact of 10 percent set–aside); *cf. Dade Cy.,* at 938–39 (100 percent set–aside on one project had too great an adverse effect on nonminority contractors, but 50 percent goal on other projects had more dispersed, and thus acceptable, effect). The 11 percent MBE participation goal is slightly less than the minority population in Pierce County (*see* Clerk's Papers, at 31 (affidavit of Sig Cook)) and this relationship is not out of line with those approved in other cases. *See Fullilove,* at 513–14 (10 percent set–aside falling halfway between 4 percent minority contractor population and 17 percent minority general population); *Schmidt v. Oakland Unified Sch. Dist., supra* at 559

(approving 25 percent set–aside in city with 34.5 percent minority population); *Dade Cy.,* at 941 (approving 50 percent black business participation goal where only 1 percent of contractors and 17 percent of general population were black).

The key factor, and the one emphasized by Chief Justice Burger, is the existence of a flexible waiver scheme. *See Fullilove,* at 487–89. In *Fullilove,* there were (1) procedures to identify MBE's which were not bona fide or which were exploiting the system, and (2) an opportunity for potential grantees to demonstrate that, even after making their best effort, they could not succeed in meeting the statutory MBE participation goal. *See Fullilove,* at 487–88. Plans approved by lower courts have exhibited similar flexibility. *See Schmidt,* at 559–60 (waiver available if compliance impracticable or insufficient MBE's; evidentiary hearing prior to rejection for noncompliance); *Dade Cy.,* at 938 (waiver available on showing of good faith effort to meet goals); *M.C. West, Inc. v. Lewis, supra* at 349 (same, noting that no contracts have been lost because of inability to find sufficient MBE's).

The plan challenged here is also sufficiently flexible. While the County's objective definition of good faith does not permit particularized consideration of the special circumstances of each individual *contractor,* it does, by its focus solely on other bids for the particular project in question, incorporate particularized consideration of the special circumstances of each individual *project.* Such "semi–individualized" consideration is analogous to the rule approved in *Fullilove* which permitted only grantees, not prime contractors who might actually do the work, to seek a waiver. *See Fullilove,* at 489. Presumably the grantee, in deciding whether to seek a waiver under such a rule, would have to look to general market conditions pertinent to its proposed project. Similarly, the County's objective definition of good faith in the present case turns on pertinent market conditions, as reflected in the bids of several contractors in the market. Such an objective definition also has

the added advantage of preventing arbitrariness in the granting or denial of waivers.

█ Since the Pierce County plan satisfies the requirements promulgated by *Fullilove,* its affirmative action provisions for MBE's do not violate the equal protection clause. This necessarily requires a conclusion that the affirmative action provisions for WBE's are permissible as well. Under the federal constitution, sex–based classifications are subject to only an intermediate level of scrutiny. *See Plyler v. Doe,* 457 U.S. 202, 218 n.16, 72 L. Ed. 2d 786, 102 S. Ct. 2382, 2395 (1982) (citing *Craig v. Boren,* 429 U.S. 190, 50 L. Ed. 2d 397, 97 S. Ct. 451 (1976), *reh'g denied,* 429 U.S. 1124 (1977)). Any program satisfying the more stringent requirements of *Fullilove* clearly satisfies this mid–tier test. *See Fullilove,* at 519 (Marshall, J., concurring) (applying mid-tier scrutiny, constitutionality of *Fullilove* affirmative action law was "not even close"). The Supreme Court has consistently approved sex–based classifications which are intended to counter the effects of other discrimination. *See, e.g., Schlesinger v. Ballard,* 419 U.S. 498, 508, 42 L. Ed. 2d 610, 95 S. Ct. 572 (1975); *Kahn v. Shevin,* 416 U.S. 351, 354–55, 40 L. Ed. 2d 189, 94 S. Ct. 1734 (1974).

### III
#### State Constitutional Limitations

Appellants also contend that the Pierce County affirmative action plan violates the state constitution. First, they claim that the plan violates Const. art. 1, § 12, our counterpart to the federal equal protection clause. Second, appellants claim that the favorable treatment accorded WBE's violates Const. art. 31, our Equal Rights Amendment (ERA).

█ In general, we have construed Const. art. 1, § 12 to provide the same protection as the federal equal protection clause. *Griffin v. Department of Social & Health Servs.,* 91 Wn.2d 616, 627, 590 P.2d 816 (1979). *But see State v. Wood,* 89 Wn.2d 97, 100, 569 P.2d 1148 (1977). While we could interpret the state provision to place more stringent

limitations on affirmative action than does *Fullilove,* we see no compelling reason to do so. If anything, we would be inclined to adopt a lesser standard, but we need not address that question here.

The ERA, on the other hand, is a very different animal from the equal protection clause—indeed, it has no counterpart in the federal constitution. The ERA absolutely prohibits discrimination on the basis of sex and is not subject to even the narrow exceptions permitted under traditional "strict scrutiny". *Darrin v. Gould,* 85 Wn.2d 859, 872, 540 P.2d 882 (1975). The ERA mandates equality in the strongest of terms and absolutely prohibits the sacrifice of equality for *any* state interest, no matter how compelling, though separate equality may be permissible in some very limited circumstances (*see Darrin,* at 872 n.8).

■ This absolute mandate of equality does not, however, bar affirmative governmental efforts to create equality in fact. *Marchioro v. Chaney,* 90 Wn.2d 298, 306, 582 P.2d 487 (1978), *aff'd,* 442 U.S. 191, 60 L. Ed. 2d 816, 99 S. Ct. 2243 (1979). To construe the ERA as entrenching the continuing effects of past inequality would be a gross perversion of its purpose.

> [The unqualified nature of the ERA] does not mean, however, that the government would be powerless to take measures designed to assure women actual as well as theoretical equality of rights. . . . [A]ffirmative action may appear, paradoxically, to conflict with the absolute nature of the Equal Rights Amendment. But where damage has been done by a violator who acts on the basis of a forbidden characteristic, the enforcing authorities may also be compelled to take the. same characteristic into account in order to undo what has been done. This form of relief is a common feature of laws seeking to eliminate discrimination, whether the restriction imposed be absolute or not.

Brown, Emerson, Falk & Freedman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women,* 80 Yale L.J. 871, 904 (1971).

As long as the law favoring one sex is intended solely to

ameliorate the effects of past discrimination, it simply does not implicate the ERA.[3] In particular, we refuse to apply by analogy the requirements imposed by *Fullilove* on racial affirmative action programs. The only requirements which a sex–based affirmative action program need satisfy are that it be intended solely to eliminate the effects of past discrimination and that there be a rational basis for concluding that such effects remain.

In some cases, the absence or presence of such a purpose will be quite clear. *See, e.g., Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 729, 73 L. Ed. 2d 1090, 102 S. Ct. 3331 (1982). In other cases, it may be less so and it may arguably appear that what the government seeks to label "affirmative action" is in reality simply an attempt to perpetuate some sex–based stereotype. *Compare Kahn v. Shevin, supra* at 353–54 (characterizing tax exemption given to widows but not widowers as intended to compensate for societal discrimination against women) *with Orr v. Orr,* 440 U.S. 268, 279–80, 59 L. Ed. 2d 306, 99 S. Ct. 1102 (1979), *cert. denied,* 444 U.S. 1060 (1980) (characterizing alimony law favoring women as perpetuating stereotype of male spouse as family provider and female spouse as house spouse). In such cases, the courts may look to various factors to ascertain the true purpose of the law, including pertinent legislative history, the extent, if any, by which the affirmative action goal exceeds the percentage of the favored sex in the work force or population at large, the statistical representation of the favored sex in the targeted occupation or population, the evidence, if any, of past discrimination, and the relationship of the affirmative action

---

[3]Of course, an affirmative action program for members of one sex must still satisfy the requirements of the federal constitution. We hold only that no additional limitations are imposed by the state constitution. While we have in the past indicated that Const. art. 1, § 12 generally imposes a "strict scrutiny" test on sex–based classifications (*see State v. Wood, supra* at 100), we now retreat from that interpretation. The ERA alone now governs our review of sex–based classifications. *Cf. State v. Adlington–Kelly,* 95 Wn.2d 917, 923, 631 P.2d 954 (1981) (precedence given to terms of more specific statute when it and general statute speak to same concern).

law to historical and discredited sexual stereotypes. *See Mississippi Univ. for Women v. Hogan,* 458 U.S. at 728–29; *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648–50, 43 L. Ed. 2d 514, 95 S. Ct. 1225 (1975). The mere recitation of a benign, compensatory purpose is not an automatic shield and, because sex–based classifications intended to do other than eliminate the effects of past inequities are almost absolutely prohibited, we will inquire into legislative intent to a greater extent than we would ordinarily. *See Hogan,* 458 U.S. at 728; *Wiesenfeld,* at 648.

We are satisfied that the only conceivable purpose of the Pierce County plan in the present case is to ameliorate the effects of past discrimination. This is not only the purpose recited in the law, but finds ample support in the surrounding circumstances. No legislative history indicates any contrary purpose. *Cf. Wiesenfeld,* at 648–50. The 1 percent goal is still well below the percentage of women in the work force and population at large and can hardly be characterized as intended to affirmatively injure men. The underrepresentation of women and the history of discrimination in the construction industry is legion. *See, e.g.,* B. Babcock, A. Freedman, E. Norton & S. Ross, *Sex Discrimination and the Law: Causes and Remedies* 521 (1975). Finally, the law here does not incorporate any traditional discredited sexual stereotype but runs directly counter to the traditional stereotype of women as unable to perform physically strenuous and/or mechanically complex labor. *Cf. Darrin v. Gould, supra* at 875–76 (overturning law barring high school girls from participating in interscholastic contact football program).

We hold that the affirmative action plan challenged herein violates neither federal nor state law. The judgment of the trial court is therefore affirmed.

WILLIAMS, C.J., and STAFFORD, BRACHTENBACH, DOLLIVER, and PEARSON, JJ., concur.

DORE and DIMMICK, JJ., concur in the result.

ROSELLINI, J. (concurring)—I concur in the result reached by the majority. I write separately, however, only because I do not agree with the majority's reliance upon past discrimination to justify present affirmative action programs. I believe this rationale is unwise for two reasons.

First, relying upon past discrimination to justify current programs of necessity involves the always difficult and frequently impossible task of substantiating the claim of past discrimination. Here, the majority must resort to vague references to documents and meetings to establish past discrimination. The majority does not nor can it cite specific cases of past discrimination. Thus, the test it adopts locks it into a meaningless search of stale records for some evidence of past discrimination.

I find the test disturbing for a second reason. Although I recognize that the past discrimination perpetuating underrepresentation test has been explicitly recognized and sanctioned by the United States Supreme Court, *see Fullilove v. Klutznick,* 448 U.S. 448, 65 L. Ed. 2d 902, 100 S. Ct. 2758 (1980), I cannot help but feel that in so doing, the court engaged in a bit of self–deception and legal fiction. In each affirmative action case, the courts are relegated to sanctioning a form of relief that is potentially unpopular. Affirmative action programs and quotas frequently generate hostility and ill will among those white workers who are affected by them. On the other hand, courts recognize the need "to persuade the next generation of minorities that they do have a chance to succeed in this complicated and competitive world." Schatzki, *United Steelworkers of America v. Weber: An Exercise in Understandable Indecision,* 56 Wash. L. Rev. 51, 60 (1980).

Affirmative action programs, such as that implemented by Pierce County, attempt to achieve that goal by providing present opportunities to minorities in current programs. Past discrimination plays little part in that remedial goal, except as an example of past mistakes to be avoided.

Thus, I suggest that, for the sake of judicial honesty and simplicity, the test be only whether the program is designed

to remedy current underrepresentation. Here, the record disclosed such underrepresentation, which Pierce County had a valid interest in curing. I therefore agree with the result of the majority.