**2023 IL 127169**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 127169)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
ANGELA J. WELLS, Appellee.

*Opinion filed November 30, 2023.*

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Overstreet, Holder White, and Rochford concurred in the judgment and opinion.

Justice Neville dissented, with opinion.

Justice O'Brien took no part in the decision.

# OPINION

¶ 1    The petitioner, Angela Wells, pled guilty in 2001 to one count of first degree murder and was sentenced to 40 years in prison. More than 16 years later, she filed

a petition for a reduced sentence pursuant to section 2-1401(b-5) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401(b-5) (West 2016)). The State filed a motion to dismiss the petition, arguing that the petitioner was not entitled to seek relief under the statute because she was sentenced pursuant to a fully negotiated plea agreement and her petition was untimely filed. The circuit court of Peoria County found subsection (b-5) inapplicable on both grounds cited by the State and dismissed the petition without holding a hearing. On appeal, the appellate court held that the petitioner was not provided with an opportunity to respond to the State's motion to dismiss. Therefore, the appellate court vacated the circuit court's dismissal order and remanded the case for further proceedings without addressing the merits. 2021 IL App (3d) 180344-U, ¶ 32.

¶ 2 For the reasons that follow, we now hold that any error in depriving the petitioner of an opportunity to respond to the dismissal motion was harmless as a matter of law because subsection (b-5) does not apply to a person who is sentenced pursuant to a fully negotiated plea agreement. We thus reverse the appellate court's judgment and affirm the circuit court's judgment.

¶ 3                                    BACKGROUND

¶ 4 On May 1, 2001, the petitioner and her husband, Ronald Wells, were charged by a bill of indictment with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2000)) and one count of concealment of a homicidal death (*id.* § 9-3.1(a)) for allegedly murdering Jamie Weyrick on March 15, 2001, and burying his body in their backyard. The petitioner entered into a fully negotiated plea agreement with the State, whereby the petitioner agreed to plead guilty to one count of first degree murder and testify truthfully at her husband's trial in exchange for a sentence of 40 years' imprisonment and the dismissal of the remaining charges.

¶ 5 At the October 29, 2001, plea hearing, the assistant public defender informed the trial court of the terms of the plea agreement. The petitioner would plead guilty to first degree murder as charged in count III of the bill of indictment, receive a sentence of 40 years' incarceration in the Department of Corrections, and if called to testify, would testify truthfully in the trial of her husband, Ronald Wells. The trial court read the charge in count III, which stated that, on or about March 15,

2001, Ronald Wells and the petitioner committed the offense of first degree murder in that "they, without lawful justification stabbed Jamie Weyrick with a knife, struck him on the head with a hammer and confined him in a freezer, knowing such acts created a strong probability of death to Jamie Weyrick[,] thereby causing the death of Jamie Weyrick." See *id.* § 9-1(a)(2). The trial court admonished the petitioner in accordance with Illinois Supreme Court Rule 402 (eff. July 1, 1997), and she indicated she understood and agreed to the admonishments.

¶ 6        The assistant state's attorney recited the following factual basis for the plea agreement. On March 18, 2001, Brenda Weyrick reported to the police that her 20-year-old son, Jamie, had been missing since March 14, 2001. She reported that Jamie had received a tax refund check in the amount of approximately $2000 and had cashed the check shortly before his disappearance. The investigating police officers learned that Jamie was seen in the company of Ronald Wells on March 15, 2001. The police interviewed both Ronald Wells and the petitioner and searched their home. During the search, they discovered Jamie Weyrick's body buried in the backyard. An autopsy revealed that the cause of death was multiple blunt force injuries, sharp force injuries, and asphyxia.

¶ 7        In a subsequent interview with police detectives, the petitioner gave a videotaped statement after being read her *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). According to her statement, on the evening of March 15, 2001, she was at home with her four children when her husband, Ronald, came home with Weyrick. Ronald told Weyrick to go upstairs. Ronald then told the petitioner that he intended to kill Weyrick because Weyrick had a large sum of money. The petitioner said that she pleaded with her husband not to kill Weyrick but that he ignored her pleadings and went upstairs. The petitioner heard a struggle; then she saw Weyrick run down the stairs with Ronald in pursuit. She saw Ronald stab Weyrick with a knife. Believing that Weyrick was deceased, the petitioner and Ronald carried him to the basement and placed him in a large freezer. Ronald then took some money and left the house.

¶ 8        During Ronald's absence, the petitioner heard noises coming from the freezer and discovered that Weyrick was still alive. She hit him with a hammer and stabbed him. She then summoned her 13-year-old stepson, Destin, to the basement and ordered him to sit on top of the freezer. She and Destin sat and waited a long time

until Weyrick was deceased. Ronald returned home the following day. On that day, Weyrick's body was removed from the freezer and buried in the backyard.

¶ 9        The assistant state's attorney apprised the court that the testimony of Destin, the petitioner's stepson, would corroborate certain aspects of her account, including that Ronald came home with Weyrick, the two men went upstairs, there was a struggle, they came back down the stairs, Ronald and the petitioner placed Weyrick in the freezer, and the petitioner summoned Destin to come down to the basement.

¶ 10        Following the State's recitation of the factual basis for the plea agreement, the trial court further admonished the petitioner consistent with Rule 402. The trial court accepted the plea, entered judgment on count III of the bill of indictment, and dismissed the remaining counts. The trial court then sentenced the petitioner to 40 years in prison pursuant to the terms of the plea agreement. The court stayed the mittimus until such time as the petitioner fulfilled her promise to testify truthfully at her husband's trial. The court also instructed the petitioner about her rights of appeal in accordance with Illinois Supreme Court Rule 604(d) (eff. Nov. 1, 2000).

¶ 11        In November 2001, the petitioner testified at the trial of her husband, Ronald Wells, and her testimony was consistent with the factual basis for her plea agreement. Accordingly, the trial court vacated the order staying the mittimus. During the period from 2006 to 2015, the petitioner filed three section 2-1401 petitions seeking relief from judgment, all of which were dismissed.

¶ 12        On January 3, 2018, more than 16 years after her judgment of conviction and sentence, the petitioner filed a *pro se* petition for relief from judgment under section 2-1401(b-5) of the Code. 735 ILCS 5/2-1401(b-5) (West 2016). Subsection (b-5), which was added to section 2-1401 on January 1, 2016 (see Pub. Act 99-384, § 10 (eff. Jan. 1, 2016)), allows a person who has been convicted of a forcible felony to petition the trial court for sentencing relief if his or her participation in the offense was related to him or her having been a victim of domestic violence. 735 ILCS 5/2-1401(b-5) (West 2016).

¶ 13        In her petition and accompanying documents, the petitioner alleged that her husband, Ronald Wells, had physically abused her from 1990 through 2001. She alleged that she had been "punched, kicked, slapped, [and] drag[ged] on the floor on a regular basis for years." On one occasion, Ronald allegedly held a gun to the

petitioner's head and pulled the trigger, but the gun jammed. In an affidavit, the petitioner averred that she was afraid to speak out about being a victim of domestic violence. The petition listed several injuries that the petitioner alleged were caused by Ronald's abuse—a shotgun wound to her arm; a black eye; trauma to her left foot; and pain in her neck, knee, and finger. Medical records attached to the petition indicated that the petitioner had gone to the hospital to be treated for these injuries. She alleged, however, that she had lied to medical personnel about the origins of her injuries because Ronald was with her at the hospital. The petition also alleged verbal abuse by Ronald, including threats that he would hurt the petitioner or their children if she did not do what he wanted. Another exhibit, a Department of Children and Family Services form from April 2001, included a statement from the petitioner's father, who stated that Ronald had physically abused the petitioner for years but that she would not leave him.

¶ 14        The petition averred that the crime for which the petitioner was convicted was connected to her being a victim of domestic violence because she acted out of "fear and compulsion" and "fear from intimidation by the co-defendant/husband of physical violence she would suffer and threats of peril." In an attached letter, the petitioner stated that she knew she should have called the police but that she hit the victim with a hammer and stabbed him with a knife because she was afraid that Ronald was returning home. She stated, "I believe I would have met the same fate as my victim because imminent bodily harm would have been inflicted upon me if I didn't do what my co-defendant/husband said."

¶ 15        The petitioner also averred, consistent with the statutory requirements, that the crime was a forcible felony; no evidence of Ronald's abuse was presented at sentencing; she was unaware of the significance of the domestic violence at the time of sentencing; and the domestic violence evidence was material, noncumulative to other evidence offered at the sentencing hearing, and of such a conclusive character that it would likely change the sentence imposed by the original trial court. See *id.* In her prayer for relief, the petitioner requested a reduced sentence but did not request to vacate her guilty plea.

¶ 16        On March 14, 2018, the State filed a motion to dismiss the petition for relief from judgment, based on three grounds. First, the State contended that relief under subsection (b-5) was unavailable to the petitioner because the statute does not apply

- 5 -

to a person who was sentenced pursuant to a fully negotiated plea agreement and the petitioner waived any challenge to her sentence by pleading guilty. Second, the State contended that the petition was untimely because it was filed beyond the two-year statute of limitations in subsection (c). See *id.* § 2-1401(c). Finally, the State contended that the petition lacked merit because it failed to establish, by a preponderance of the evidence, that the petitioner was a victim of domestic abuse and that her participation in the crime was related to her having been a victim of domestic abuse. The certificate of service indicated that the State served the motion on the petitioner at the Logan Correctional Center by regular mail on the same day the motion was filed.

¶ 17    One week later, on March 21, 2018, the trial court entered a written order allowing the State's motion and dismissing the subsection (b-5) petition, "[u]pon consideration of the pleadings, review of the file contents and the procedural history of [the petitioner's] case." The record does not indicate that a hearing took place or that the petitioner was given notice of the proceeding at which the trial court ruled on the State's motion to dismiss. The court's order stated that relief under subsection (b-5) was not available for the first two reasons listed in the State's motion to dismiss, *i.e.*, that the petitioner was sentenced as part of a fully negotiated plea agreement and the petition was untimely. The order further stated that the petitioner did not show due diligence in that she waited more than two years after the January 1, 2016, enactment of subsection (b-5) to file her petition for relief from judgment.

¶ 18    The petitioner filed a motion to reconsider, alleging that it would be fundamentally unfair to deny her the ability to seek relief because she was convicted and sentenced nearly 15 years before subsection (b-5) was enacted. On May 15, 2018, the trial court denied the motion to reconsider. Thereafter, the petitioner filed a timely notice of appeal in the appellate court.

¶ 19    On appeal, the petitioner argued that her petition set forth a meritorious claim for relief under subsection (b-5). 2021 IL App (3d) 180344-U, ¶ 26. Although the petition itself did not contain a request to vacate her plea, the petitioner asserted to the appellate court that she was, in fact, seeking the vacatur of her guilty plea in addition to a reduction in her sentence. *Id.* ¶ 2 n.1. The petitioner also argued that

the trial court violated her due process rights by ruling on her petition without giving her an opportunity to respond to the State's dismissal motion. *Id.* ¶ 2.

¶ 20 The appellate court noted that the trial court ruled on the State's motion to dismiss seven days after it was mailed to the petitioner and filed with the court, without giving her an opportunity to respond to the motion. *Id.* ¶ 28. It held that the trial court's premature dismissal of the petition with no meaningful opportunity for the petitioner to respond violated her due process rights. *Id.* The appellate court further held that the error was not harmless because the petitioner was deprived of an opportunity to amend her petition or respond to the State's motion. *Id.* ¶ 32. In so holding, the appellate court did not address the merits of the parties' arguments; instead, it simply vacated the trial court's order of dismissal and remanded the case to the trial court for further proceedings. *Id.* ¶¶ 32, 34.

¶ 21 This court allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2020). We also allowed leave to the following organizations to file a joint brief as *amici curiae* in support of the petitioner's position: the American Civil Liberties Union of Illinois, Ascend Justice, the Illinois Coalition Against Domestic Violence, the Illinois Prison Project, Legal Action Chicago, the Legal Aid Society of Metropolitan Family Services, Life Span, Mujeres Latinas en Acción, the Network: Advocating Against Domestic Violence, the Shriver Center on Poverty Law, and the Women's Justice Institute. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 22 ANALYSIS

¶ 23 Section 2-1401 of the Code authorizes a trial court to vacate or modify a final order or judgment in a civil or criminal proceeding more than 30 days after the judgment. *People v. Thompson*, 2015 IL 118151, ¶ 28. The trial court's dismissal of a section 2-1401 petition on legal grounds is reviewed *de novo*. *Id.* ¶ 25. Subsection (b-5) was added to section 2-1401 by an amendment that became effective on January 1, 2016. See Pub. Act 99-384, § 10 (eff. Jan. 1, 2016) (amending 735 ILCS 5/2-1401). At the time the petition in this case was filed, subsection (b-5) stated, in relevant part:

"(b-5) A movant may present a meritorious claim under this Section if the allegations in the petition establish each of the following by a preponderance of the evidence:

(1) the movant was convicted of a forcible felony;

(2) the movant's participation in the offense was related to him or her previously having been a victim of domestic violence as perpetrated by an intimate partner;

(3) no evidence of domestic violence against the movant was presented at the movant's sentencing hearing;

(4) the movant was unaware of the mitigating nature of the evidence of the domestic violence at the time of sentencing and could not have learned of its significance sooner through diligence; and

(5) the new evidence of domestic violence against the movant is material and noncumulative to other evidence offered at the sentencing hearing, and is of such a conclusive character that it would likely change the sentence imposed by the original trial court." 735 ILCS 5/2-1401(b-5) (West 2016).

¶ 24    In the case at bar, the trial court ruled on the State's motion to dismiss the petition seven days after it was mailed to the petitioner and filed with the court. The trial court did not hold a hearing or allow the petitioner an opportunity to respond to the motion. On appeal to this court, the State concedes that the trial court violated the petitioner's procedural due process rights, but it argues that the violation was harmless as a matter of law.

¶ 25    The right to procedural due process, which is guaranteed by the United States and Illinois Constitutions (U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2), "entitles an individual to 'the opportunity to be heard at a meaningful time and in a meaningful manner.' " *People v. Stoecker*, 2020 IL 124807, ¶ 17 (quoting *In re D.W.*, 214 Ill. 2d 289, 316 (2005)). This court has held that section 2-1401 petitions are treated as complaints inviting responsive pleadings under the usual rules of civil practice. *Id.* ¶ 18. As such, "basic notions of fairness dictate that a petitioner be afforded notice of, and a meaningful opportunity to respond to, any motion or

responsive pleading by the State." *Id.* ¶ 20. Relevant to this case, this court held in *Stoecker* that a section 2-1401 petitioner's due process rights were violated when the trial court dismissed his petition during an *ex parte* hearing without notifying the petitioner or allowing him a meaningful opportunity to respond to the State's motion to dismiss. *Id.* ¶ 22. We agree with the parties that the trial court's ruling below similarly denied the petitioner her procedural due process rights.

¶ 26    The State is correct, however, that the procedural due process violation in this case is subject to harmless error analysis. *Id.* ¶¶ 23, 25. Automatic reversal is required only where an error is deemed " 'structural.' " *Id.* ¶ 23. A procedural error such as the one that occurred here is not a structural error because it "does not necessarily render the proceedings automatically unfair or unreliable," and it is not included in the narrow class of automatically reversible errors identified by the United States Supreme Court and this court. *Id.* ¶ 25. Thus, it is amenable to harmless error review. *Id.* We will deem an error harmless where the petitioner's claims are "patently incurable as a matter of law" and no additional proceedings would result in the petitioner's prevailing on his or her claims. *Id.* ¶ 26.

¶ 27    In support of its claim that the due process violation in the instant matter was harmless, the State argues that (1) the petition lacked legal merit because subsection (b-5) does not apply to a guilty plea defendant who was sentenced pursuant to a fully negotiated plea bargain and (2) the petition was untimely because it was filed more than two years after the judgment.

¶ 28                    I. Fully Negotiated Guilty Plea Agreement

¶ 29    The State argues that the relief provided in subsection (b-5) is unavailable to the petitioner because she pled guilty and was sentenced pursuant to a fully negotiated plea agreement. In response, the petitioner contends that the State forfeited its guilty plea argument by failing to raise it in the appellate court or in its petition for leave to appeal. We disagree that the issue is forfeited.

    "It is well settled that, when the appellate court reverses the judgment of the trial court and the appellee in the appellate court then brings the case to this court on appeal, that party may raise any issues properly presented by the record

to sustain the judgment of the trial court, even if those issues were not raised in the appellate court." *People v. Brown*, 2020 IL 125203, ¶ 29.

Here, the State presented its guilty plea argument to the trial court, and the trial court ruled in the State's favor on that issue. The petitioner appealed the trial court's decision. Thus, the issue is properly presented by the record, and the State, as the appellee in the appellate court proceedings, has not forfeited the issue by failing to raise it in the appellate court. *Id.*; see also *Bell v. Hutsell*, 2011 IL 110724, ¶¶ 20-21.

¶ 30    With regard to the State's failure to raise the argument in its petition for leave to appeal, this court has held that the failure to include an issue in a petition for leave to appeal is not an absolute, jurisdictional bar to this court's ability to review it. *Brown*, 2020 IL 125203, ¶¶ 30-31 (citing *In re Rolandis G.*, 232 Ill. 2d 13, 37 (2008)). Rather, it is a principle of administrative convenience that allows this court the discretion to review or to decline to review an issue that has not been properly preserved. *Id.* ¶ 31. The petitioner has not presented a compelling reason for this court to decline to reach the issue. Whether her fully negotiated guilty plea excludes her from obtaining relief under subsection (b-5), as a matter of law, is " 'inextricably intertwined' " with the issue of whether the due process violation amounted to harmless error. See *id.* ¶¶ 31-32 (quoting *People v. McKown*, 236 Ill. 2d 278, 310 (2010)). Furthermore, the issue was presented to the trial court and was fully briefed and argued in this court. Consequently, we will address the State's argument.

¶ 31    Turning to the merits, at issue is whether a criminal defendant who pleads guilty pursuant to a fully negotiated plea agreement is entitled to seek relief from his or her sentence under subsection (b-5). A fully negotiated plea agreement, like the one in this case, is one in which a defendant pleads guilty to certain charges in exchange for the State's agreement to dismiss other charges and recommend a specific sentence. *People v. Evans*, 174 Ill. 2d 320, 327 (1996); see also *People v. Linder*, 186 Ill. 2d 67, 78 (1999) (Freeman, C.J., specially concurring). To determine the applicability of subsection (b-5) in these circumstances, we must determine what the legislature intended when it enacted the statute. The best indication of legislative intent is the plain statutory language, given its natural meaning. *Hernandez v. Lifeline Ambulance LLC*, 2020 IL 124610, ¶ 16. In interpreting a

statute, we may not add words or fill in perceived omissions. It is the judiciary's role to enforce clear, unambiguous statutes as written, not to question the wisdom of the legislature. See *Manago v. County of Cook*, 2017 IL 121078, ¶ 10 ("Whenever possible, courts must enforce clear and unambiguous statutory language as written, without reading in unstated exceptions, conditions, or limitations."). In determining the meaning of a statute, this court may consider the consequences of construing the statute one way or another. *United States v. Glispie*, 2020 IL 125483, ¶ 10. In doing so, we presume that the legislature did not intend absurdity, inconvenience, or injustice. *People v. Casler*, 2020 IL 125117, ¶ 24. The construction of a statute is an issue of law, which is subject to *de novo* review. *Manago*, 2017 IL 121078, ¶ 10.

¶ 32    The plain language of subsection (b-5) clearly indicates that the only relief available under the statute is sentencing relief. The statute refers to the evidence, or lack thereof, presented "at the movant's sentencing hearing" and "at the time of sentencing." 735 ILCS 5/2-1401(b-5)(3), (4) (West 2016). It also requires the movant to show that "the new evidence of domestic violence against the movant is material and noncumulative to other evidence offered at the sentencing hearing, and is of such a conclusive character *that it would likely change the sentence imposed by the original trial court*." (Emphasis added.) *Id.* § 2-1401(b-5)(5). Conversely, referring specifically to subsection (b-5), no language in the statute allows a movant to seek relief from his or her conviction or guilty plea. Further, the statute does not authorize a trial court to vacate a conviction or a guilty plea. Thus, the plain statutory language shows that the General Assembly chose to limit the scope of relief available under subsection (b-5) to relief from sentences, not convictions.

¶ 33    In a fully negotiated guilty plea agreement, however, the sentence is *inseparable* from the conviction. *Evans*, 174 Ill. 2d at 332. "[U]nder these circumstances, the guilty plea and the sentence 'go hand in hand' as material elements of the plea bargain." *Id.* For this reason, this court has held that a defendant who enters into a fully negotiated plea bargain cannot unilaterally seek a reduction in his or her sentence after the trial court has accepted the plea and entered judgment. *Id.* at 327-28; *People v. Absher*, 242 Ill. 2d 77, 87-88 (2011). If a defendant were permitted to challenge his or her fully negotiated sentence without first moving to withdraw the guilty plea, it would encourage gamesmanship and "fl[y] in the face of contract law principles" by "seeking to hold the State to its part

of the bargain while unilaterally modifying the sentence[ ] to which [the defendant] had earlier agreed." *Evans*, 174 Ill. 2d at 327.

¶ 34     Applying this principle to the case before us, it is clear that subsection (b-5) does not provide a procedure or mechanism for vacating a conviction or a guilty plea in the context of a fully negotiated plea agreement. By its plain terms, subsection (b-5) allows *only* a vacatur of the original sentence. It does not allow a petitioner to move to withdraw his or her plea, nor does it allow a trial court to consider the voluntariness of the plea. When the legislature enacts a statute, we presume that it acted with full knowledge of all existing statutory and caselaw. *People v. Johnson*, 2019 IL 123318, ¶ 42. Thus, at the time the legislature added subsection (b-5) to section 2-1401 of the Code, it was presumably aware of this court's caselaw holding that a guilty plea and sentence go hand in hand as material elements of a *fully negotiated* plea bargain (see *Evans*, 174 Ill. 2d at 332). Yet, nothing in the statutory language suggests that the legislature intended to allow relief in the form of vacatur of a guilty plea. This court may not depart from a statute's plain language by reading into it exceptions, limitations, or conditions that the legislature did not express. *People v. Witherspoon*, 2019 IL 123092, ¶ 24. Accordingly, we must conclude that the legislature did not intend for the statute to apply to petitioners who are sentenced pursuant to *fully negotiated* plea agreements.

¶ 35     Our interpretation of the statute is strengthened when we consider the consequences of construing the statute to include fully negotiated guilty plea petitioners, as the petitioner in this case asks us to do. See *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 280 (2003) (it is appropriate to consider the consequences that would result from construing a statute one way or the other). Under the petitioner's proposed reading of the statute, a defendant who is sentenced following a trial can obtain sentencing relief under subsection (b-5) but cannot have his or her conviction vacated, while a petitioner who is sentenced following a fully negotiated plea agreement can have both his or her sentence and conviction vacated. This unequal treatment of defendants cannot be what the legislature intended. In construing the statute, we must presume that the legislature did not intend absurdity or injustice. *Id.* The petitioner in this case argues that there is nothing in subsection (b-5) that expressly precludes a defendant who pleads guilty from moving to challenge his or her sentence under the statute. But this argument misses the point. As we have explained, nothing in the statute allows a petitioner to seek relief from

a guilty plea or conviction, and a defendant who has a fully negotiated guilty plea agreement cannot later move for a sentence reduction without also moving to withdraw his or her plea and vacate the conviction. Thus, the clear legislative intent underpinning the statute in question, specifically subsection (b-5), is to exclude petitioners who have fully negotiated guilty plea agreements.

¶ 36        Allowing a defendant to *unilaterally* vacate his or her sentence without first vacating his or her fully negotiated guilty plea is an extraordinary remedy, in that it contradicts established caselaw. If the legislature had intended to provide sentencing relief to defendants who had fully negotiated guilty plea agreements, we believe it would have used language that plainly expressed such a purpose. It is the role of this court to interpret the statute as written. *McDonald v. Symphony Bronzeville Park, LLC*, 2022 IL 126511, ¶ 49. We may not read words into the statute in order to achieve a particular result. See *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 50 ("Of all the principles of statutory construction, few are more basic than that a court may not rewrite a statute to make it consistent with the court's own idea of orderliness and public policy."); *People v. Smith*, 2016 IL 119659, ¶ 28 ("No rule of construction authorizes this court to declare that the legislature did not mean what the plain language of the statute imports, nor may we rewrite a statute to add provisions or limitations the legislature did not include."). The clear, unambiguous language of subsection (b-5) provides relief from *sentences*, not convictions. Accordingly, the only logical conclusion we can draw from the statutory language is that subsection (b-5) does not apply to a petitioner who pleads guilty and is sentenced pursuant to a fully negotiated plea agreement.

¶ 37        Despite the plain language in the statute, the petitioner in this case argues that the statute nevertheless applies to a fully negotiated guilty plea scenario, based on this court's holding in *People v. Reed*, 2020 IL 124940. At issue in *Reed* was whether a defendant who pleads guilty can assert an actual innocence claim under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)) without challenging the validity of his or her plea. *Reed*, 2020 IL 124940, ¶¶ 20, 22. This court held that such claims are allowed. *Id.* ¶ 37. We reasoned that, "[w]hen met with a truly persuasive demonstration of innocence, a conviction based on a voluntary and knowing plea is reduced to a legal fiction," thus triggering the additional due process protections in our state constitution (Ill. Const. 1970, art. I,

§ 2). *Reed*, 2020 IL 124940, ¶ 35 (citing *People v. Washington*, 171 Ill. 2d 475, 488 (1996)).

¶ 38    The petitioner argues that the analysis set forth in *Reed* applies equally to subsection (b-5) claims because the requirements for a petition in subsection (b-5) "largely mirror" the requirements for actual innocence claims. See 735 ILCS 5/2-1401(b-5)(1)-(5) (West 2016). The petitioner argues, therefore, that this court need not treat petitioners who are sentenced pursuant to fully negotiated plea agreements differently from defendants convicted after a trial in determining the application of subsection (b-5). We find *Reed* to be inapposite. By its nature, an actual innocence claim challenges a *conviction*, not a sentence. The remedy for a successful claim of actual innocence is a new trial. *People v. Coleman*, 2013 IL 113307, ¶ 97. The only available remedy under subsection (b-5), by contrast, is relief from a *sentence*, not a conviction. Furthermore, subsection (b-5) claims are purely statutory, unlike actual innocence claims, which are grounded in constitutional due process rights. Thus, *Reed* has no bearing on this case and fails to support the petitioner's argument.

¶ 39    The petitioner next asserts that recent legislative history supports her claim that section (b-5) applies to a defendant who was sentenced under a fully negotiated guilty plea agreement. Following oral arguments in this case, the petitioner filed a motion to cite additional authority, which we allowed. The motion cites Public Act 103-403 (eff. Jan. 1, 2024) (amending 735 ILCS 5/2-1401), which amended section 2-1401 in several respects, including adding language to subsection (b-5) to include gender-based violence. The motion also includes an unofficial transcription of a legislative debate of Senate Bill 2260 on May 11, 2023, prepared by the petitioner's counsel from an audio file. 103d Ill. Gen. Assem., Senate Bill 2260, 2023 Sess. According to the transcription, the bill's sponsor in the Illinois House of Representatives, Representative Kelly Cassidy, remarked that the amended version of the statute "wraps in plea deals" and "allow[s] for those survivors who were sentenced, either through a plea deal or a full sentencing hearing, to have all of the factors of gender-based violence considered." 103d Ill. Gen. Assem., House Proceedings, May 11, 2023 (statements of Representative Cassidy) (unofficial transcript provided by petitioner). The petitioner asserts that these comments bolster her argument that subsection (b-5) includes fully negotiated plea bargains. We disagree.

¶ 40    Nothing in the amended language *mentions* plea bargains or provides a mechanism for a petitioner to undo a valid, fully negotiated plea agreement. Moreover, we may not use legislative history to read words into a clear, unambiguous statute. *People v. Collins*, 214 Ill. 2d 206, 214 (2005). Regardless of the general comments of a legislator, the law that was voted on and passed by the legislature and signed by the Governor did not contain the language that the petitioner now seeks to read into the law. As we have held, the plain, unambiguous language in the statute indicates that the statute does not apply to *fully negotiated* guilty pleas. Consequently, the additional authority cited by the petitioner does not affect our resolution of this issue.

¶ 41    We hold that the relief set forth in subsection (b-5) excludes petitioners who are sentenced pursuant to fully negotiated plea agreements and, therefore, the petition in this case lacked a legal basis for relief. Because the petitioner's subsection (b-5) claim was "untenable as a matter of law" (*Stoecker*, 2020 IL 124807, ¶ 33) and no additional pleadings or proceedings would enable her to prevail on her claim for relief, the trial court's error in prematurely dismissing the petition was harmless (see *id.* ("Reversal and remand would serve no purpose and would merely delay the dismissal of the meritless petition.")).

¶ 42                           II. Statute of Limitations

¶ 43    The State raises an alternative argument that the procedural due process error was harmless because the petition was filed outside the two-year limitations period that ordinarily applies to section 2-1401 petitions. 735 ILCS 5/2-1401(b-5), (c) (West 2016). In light of our holding that subsection (b-5) is inapplicable to the fully negotiated guilty plea scenario presented by this appeal, we need not address the State's statute of limitations argument.[1]

---

[1]We note that the recent amendments to section 2-1401 add language to subsection (c) that states, *inter alia*, "[e]xcept as provided in *** subsection (b-5) *** of this Section, *** the petition must be filed not later than 2 years after the entry of the order or judgment." Pub. Act 103-403, § 5 (eff. Jan. 1, 2024) (amending 735 ILCS 5/2-1401(c)).

¶ 44                                        CONCLUSION

¶ 45        For the foregoing reasons, the judgment of the appellate court is reversed, and
the judgment of the circuit court is affirmed.


¶ 46        Appellate court judgment reversed.

¶ 47        Circuit court judgment affirmed.


¶ 48        JUSTICE NEVILLE, dissenting:

¶ 49        The majority misconstrues section 2-1401(b-5) of the Code of Civil Procedure
(Code) (735 ILCS 5/2-1401(b-5) (West 2016)) by reading into the remedial statute,
contrary to the language in the statute, exceptions and conditions the legislature did
not create. The majority's construction of subsection (b-5) severely restricts the
number of victims of domestic violence who can use the prescribed sentencing
remedies. Therefore, because the majority misconstrues subsection (b-5), I
respectfully dissent.


¶ 50                                      I. BACKGROUND

¶ 51        Ms. Wells, who participated in a brutal murder in 2001, agreed to plead guilty
and to testify against her husband, Ronald Wells, in exchange for the State's
recommendation of a sentence of 40 years in prison. On October 29, 2001, the
circuit court accepted the guilty plea and then held a sentencing hearing at which
the court accepted the State's recommendation and imposed the agreed sentence.

¶ 52        In December 2017, Ms. Wells mailed from prison a petition under subsection
(b-5) for relief from the sentence. In accord with the statute, Ms. Wells alleged that
the court found her guilty of a forcible felony and her "participation in the offense
was related to her previously *** being a victim of domestic violence, as
perpetrated by an intimate partner." She "presented no evidence of domestic
violence at sentencing hearing," and she "was unaware of the mitigating nature of

- 16 -

the evidence of the domestic violence at the time of the sentencing and could not have learned of its significance sooner through diligence." See *id.* She added detailed accounts of the domestic violence she endured, supported by several exhibits, including medical records. She explained the connection between the domestic violence and her participation in the murder, as she alleged her husband told her to help him move Weyrick to the freezer. When she heard noises from the freezer, she panicked, fearing what her husband would do to her and her children. She alleged, "I believe I would have met the same fate as my victim because imminent bodily harm would have been inflicted upon me."

¶ 53    The circuit court granted the State's motion to dismiss the petition without permitting Ms. Wells to respond to the State's motion. The appellate court reversed and remanded for further proceedings on the petition.

¶ 54                                II. ANALYSIS

¶ 55    The State contends subsection (b-5) does not apply to Ms. Wells because she fully negotiated her guilty plea. To resolve the issue, we must construe section 2-1401(b-5).

¶ 56    Our interpretation must start with the words of the statute. *Manago v. County of Cook*, 2017 IL 121078, ¶ 10. "Whenever possible, courts must enforce clear and unambiguous statutory language as written, without reading in unstated exceptions, conditions, or limitations." *Id.* The court "must view and give effect to the entire statutory scheme. *** The court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *Board of Education of Chicago v. Moore*, 2021 IL 125785, ¶ 20.

¶ 57                A. Subsection (b-5) Constitutes Remedial Legislation,
                        Which the Court Must Interpret Liberally to
                                Effectuate Its Purpose

¶ 58    When the legislature enacts legislation to remedy an imperfection in the law, the legislation should be construed liberally to effectuate its purpose. *People v.*

- 17 -

*Rodriguez*, 339 Ill. App. 3d 677, 681 (2003); *S.N. Nielsen Co. v. Public Building Comm'n of Chicago*, 81 Ill. 2d 290, 298 (1980). Section 2-1401(b-5)(2) of the Code, a remedy for overly harsh sentences imposed on victims of domestic violence, permits the court to reduce a sentence imposed on a defendant who shows that her "participation in the offense was related to *** her previously having been a victim of domestic violence." 735 ILCS 5/2-1401(b-5)(2) (West 2016).

¶ 59        The General Assembly adopted subsection (b-5) with only a brief discussion of the intent of the legislation. The bill's sponsor in the House said:

"[The Act] effectively does two things. One, creates a mitigating factor for domestic violence in the case of an intimate partner. Second, provides for the possibility of postjudgment relief in a case where there was no evidence of domestic violence against the person presented at the sentencing hearing. In the case of a forcible felony where the domestic violence may have been a contributing factor, victims would be eligible for the possibility of relief. It is not a mandate. It is an option for judges to provide post-judgment relief for up to two years after the original sentencing. The time lapse is because often, given the nature of domestic violence, it takes some time for a partner through counseling through time to understand what's happened to them. It gives us an option to deal with some of these folks inside the system." 99th Ill. Gen. Assem., House Proceedings, May 25, 2015, at 28-29 (statements of Representative Mitchell).

¶ 60        When the legislature amended section 2-1401 in May 2023, clarifying that the two-year limitations period of section 2-1401(c) did not apply to claims under subsection (b-5), the amendment's sponsor further explained the purpose of subsection (b-5) and the need for the amendment. She said:

"[S]ome ambiguity in the language has led to confusion and very few people actually getting relief under this law. ***

    *** [O]ften survivors accept plea deals that didn't take[ ] into account the abuse they experience. Because in some cases domestic violence was not even a mitigating factor until the original Act was enacted in 2016. So this will allow for those survivors who were sentenced, either through a plea deal or a full sentencing hearing, to have all of the factors of gender-based violence

- 18 -

considered, and ensure that they receive a fair sentence, and that mistakes of the past can be rectified.

It takes care of many past wrongs. We have survivors in prison who are not allowed to talk about being raped by their husbands because at the time of their sentencing marital rape was not even a crime. We have survivors in prison because their abusers or traffickers forced them into the impossible choice of being present while they did horrible things, or risk becoming another fatality." 103d Ill. Gen. Assem., House Proceedings, May 11, 2023 (statements of Representative Cassidy) (unofficial transcript provided by petitioner).

¶ 61    Representative Cassidy then addressed a question about a specific hypothetical situation where a domestic abuser compelled a victim to assist in the commission of a crime. She explained subsection (b-5) "would allow that to be contemplated to resentence—to give me an opportunity to argue for a resentencing." *Id.* She also specifically addressed the effect of the legislation on defendants who pled guilty:

"Rep. [Davidsmeyer]: Okay, and is this only in plea deals or this in any case that you can prove that that was likely?

\* \* \*

Rep. Cassidy: [This covers] any case.

\*\*\*

Rep. Cassidy: This wraps in plea deals." *Id.* (statements of Representatives Davidsmeyer and Cassidy).

¶ 62    As the legislative history shows, subsection (b-5) constitutes remedial legislation intended to mitigate overly harsh penalties imposed on survivors of domestic violence. See *Davidson v. United States*, 467 A.2d 1282, 1283 (D.C. 1983) (statute that "ameliorates the harshness of a jail term" is remedial); *State v. Kerns*, 394 S.E.2d 532, 536 (W. Va. 1990) (statute permitting work release for prisoners is remedial in nature); *State v. Von Geldern*, 638 P.2d 319, 323 (Haw. 1981) (amendment to "remedy the inflexibility of the previous mandatory sentencing provisions" is remedial); *Byrd v. Johnson*, 16 S.E.2d 843, 846 (N.C. 1941) ("Statutes are remedial and retrospective, in the absence of directions to the

contrary, when they *** extenuate or mitigate offenses ***." (Internal quotation marks omitted.)); *People v. Attaway*, 53 Misc. 3d 435, 441 (N.Y. County Ct. 2016) ("reform [of] unduly harsh sentencing" makes statute remedial).

¶ 63       Illinois courts have long recognized that "remedial legislation should be construed liberally to effectuate its purposes." *S.N. Nielsen*, 81 Ill. 2d at 298; see *Board of Trustees of Community College District No. 508 v. Human Rights Comm'n*, 88 Ill. 2d 22, 26 (1981) ("As remedial legislation the [Human Rights] Act should be construed liberally to effect its purpose."); *Zehender & Factor*, *Inc. v. Murphy*, 386 Ill. 258, 263 (1944) (act providing assistance for the unemployed is remedial and "entitled to receive liberal interpretation"). "Liberal statutory construction signifies an interpretation that produces broader coverage or more inclusive application of statutory concepts. [Citation.] Liberal construction is ordinarily one that makes a statute apply to more things or in more situations than would be the case under strict construction." *Board of Education of Community Consolidated School District No. 59 v. State Board of Education*, 317 Ill. App. 3d 790, 795 (2000).

¶ 64                    B. The Majority Reads Into the Statute
                  Exceptions and Conditions the Legislature Did Not Express

¶ 65       The majority holds that subsection (b-5) does not apply to defendants convicted on the basis of negotiated pleas, because this court requires those defendants to first withdraw the guilty plea before challenging the sentence, and subsection (b-5) "does not allow a petitioner to move to withdraw his or her plea." *Supra* ¶ 34. I disagree with the majority's holdings. Instead of reading the remedial statute liberally to effectuate its purpose, the majority reads the statute narrowly to ensure it has very limited effect. Subsection (b-5) includes no language that could be characterized as an exception that requires a defendant to move to withdraw his or her plea before participating in a section 2-1401 collateral proceeding. A subsection (b-5) proceeding is not a continuation of a criminal sentencing proceeding. See 735 ILCS 5/2-1401(b-5) (West 2016). A section 2-1401(b-5) proceeding is a civil proceeding in which a litigant may collaterally challenge a criminal conviction or sentence. See *People v. Vincent*, 226 Ill. 2d 1, 6-7 (2007). Rule 604(d), which requires a defendant who fully negotiated a guilty plea to withdraw the plea before

- 20 -

filing an appeal from the sentence (Ill. S. Ct. R. 604(d) (eff. July 1, 2017)), applies only to direct appeals in criminal cases and does not apply to independent, statutory, civil section 2-1401 collateral proceedings. See *People v. Flowers*, 208 Ill. 2d 291, 302-03 (2003) (requirements of Rule 604(d) are inapplicable to independent, statutory proceedings, like postconviction proceedings).

¶ 66 *Amici* point out that the majority's holding will sharply reduce the number of defendants allowed to seek relief under subsection (b-5), because "[p]leas account for nearly 95% of all criminal convictions." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010); see Stephanie Stern, Note, *Regulating the New Gold Standard of Criminal Justice: Confronting the Lack of Record-Keeping in the American Criminal Justice System*, 52 Harv. J. on Legis. 245, 247 (2015) (97% of federal convictions and 94% of state convictions stem from guilty pleas). The legislative history of the 2023 amendment shows the sponsor intended to address the problem that courts applied subsection (b-5) far too narrowly. Representative Cassidy's remarks support broad application of the subsection, particularly to defendants who entered into "plea deals" and pled guilty to crimes that resulted, in part, from domestic violence. 103d Ill. Gen. Assem., House Proceedings, May 11, 2023 (statements of Representative Cassidy) (unofficial transcript provided by petitioner).

¶ 67 The majority gives short shrift to Representative Cassidy's explanation of the operation of subsection (b-5). Her statements are not mere "general comments of a legislator." *Supra* ¶ 40. The remarks occurred in legislative debate on an amendment to section 2-1401 and specifically addressed the effect of subsection (b-5) on defendants who pled guilty. "Valuable construction aids in interpreting an ambiguous statute are the provision's legislative history and debates, and the purposes and underlying policies." *Advincula v. United Blood Services*, 176 Ill. 2d 1, 19 (1996). When construing legislation,

"it is proper to consider *** the remarks made by the legislators during debate on the legislation [citations]. As to the latter, statements by the sponsor of the legislation are especially significant since 'legislators look to the sponsor *** to be particularly well informed about its purpose, meaning, and intended effect.' " *Spinelli v. Immanuel Evangelical Lutheran Congregation, Inc.*, 144 Ill. App. 3d 325, 330 (1986) (quoting 2A Norman J. Singer, Sutherland on Statutory Construction § 48.15, at 337 (Sands 4th ed. 1984)).

The majority's rejection of the sponsor's explanation of the legislation belies the majority's claim that it seeks to give effect to the legislature's intent.

¶ 68    The legislature made subsection (b-5) applicable to all defendants, with no exception for those who pled guilty. 735 ILCS 5/2-1401(b-5) (West 2016). Courts presume that, if the legislature made no exceptions to the general language of the statute, none was intended. 82 C.J.S. *Statutes* § 370 (Aug. 2023 Update); *People v. Garner*, 147 Ill. 2d 467, 476 (1992) ("The legislature has made no exception to the rule ***. If there is to be an exception[,] *** its origin must necessarily be in the legislature."). The legislature did not require the defendants to first withdraw their guilty pleas before asking the court to reconsider their sentences. The majority pays lip service to the principle that courts must not "depart from a statute's plain language by reading into it exceptions, limitations, or conditions that the legislature did not express." *Supra* ¶ 34. The majority then reads into the statute an exception for negotiated guilty pleas, an exception the legislature did not express, and imposes a condition that defendants who negotiated pleas must withdraw their pleas before asking for relief under subsection (b-5), imposing a condition that the legislature did not express. *Supra* ¶ 34. Courts are powerless to annex to a statute a provision or condition that the legislature did not see fit to enact.

¶ 69                C. Ms. Wells's Petition Does Not Violate Contract Principles

¶ 70    The majority also relies on " 'contract law principles' " (*supra* ¶ 33 (quoting *People v. Evans*, 174 Ill. 2d 320, 327 (1996))) to support the assertion that "a defendant who enters into a fully negotiated plea bargain cannot unilaterally seek a reduction in his or her sentence after the trial court has accepted the plea and entered judgment" (*supra* ¶ 33). Ms. Wells does not unilaterally seek modification of the terms of the plea she negotiated with prosecutors acting on behalf of the State. Instead, she asks the court, in a collateral section 2-1401 proceeding, to consider evidence not presented before sentencing as possible grounds for reducing her sentence. The legislature specifically authorized defendants like Ms. Wells to ask the court to reconsider their sentences. *Smith v. Department of Registration & Education*, 412 Ill. 332, 339 (1952) (the State acts through its executive, its legislative, or its judicial authorities); Ill. Const. 1970, art. II, §§ 1, 2. The State, acting through the legislature, made the statute applicable to all defendants, not only

- 22 -

the ones convicted after a trial, who can show that their participation in the offense was related to domestic violence. 735 ILCS 5/2-1401(b-5) (West 2016). The State, acting through the courts, must accept any modification of the sentence before it can take effect, just as the State, acting through the courts, needed to accept the prosecutor's recommendation before the original plea bargain could take effect. Our rules provide: "If the defendant *** pleads guilty, but the trial judge later withdraws his or her concurrence [with the negotiated sentence] or conditional concurrence, the judge shall so advise the parties and then call upon the defendant either to affirm or to withdraw his or her plea of guilty." Ill. S. Ct. R. 402(d)(2) (eff. July 1, 2012). Thus, the negotiated plea bargain does not bind the defendant, and the defendant may withdraw from the bargain after the prosecution has fully performed its promises, if the court does not accept the negotiated sentence.

¶ 71    The United States Supreme Court, in *Hughes v. United States*, 584 U.S. ___, 138 S. Ct. 1765 (2018), reviewed a federal sentence reduction statute in a negotiated plea case. Hughes fully negotiated a plea to a narcotics distribution charge and a gun possession charge, pleading guilty in exchange for a sentence of 180 months in prison. *Id.* at ___, 138 S. Ct. at 1773-74. The district court calculated the sentencing range under statutory guidelines, noted that the agreed sentence fell some months short of the low end of the range, and accepted the plea deal. *Id.* at ___, 138 S. Ct. at 1774. Two months later the United States Sentencing Commission reduced the guideline sentences for the narcotics offense to which Hughes pled guilty. *Id.* at ___, 138 S. Ct. at 1774.

¶ 72    Hughes filed a petition under 18 U.S.C. § 3582(c)(2) (2012) for a reduction of his sentence. Section 3582(c)(2) provides,

"[I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission ***, the court may reduce the term of imprisonment, after considering the [statutory] factors ***, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.*

The district court found Hughes ineligible for the reduction and dismissed his petition. *Hughes*, 584 U.S. at ___, 138 S. Ct. at 1774. The Court of Appeals for the Eleventh Circuit affirmed. *Id.* at ___, 138 S. Ct. at 1774.

¶ 73    The United States Supreme Court held that, under the terms of the statute, all defendants, including those who fully negotiated their pleas, could petition for relief based on a change in sentencing guidelines, if the district court had considered the sentencing guidelines before imposing its initial sentence. *Id.* at ___, 138 S. Ct. at 1776. The Court said:

> "A sentence imposed pursuant to a [fully negotiated] Type-C agreement is no exception to the general rule that a defendant's Guidelines range is both the starting point and a basis for his ultimate sentence. Although in a Type-C agreement the Government and the defendant may agree to a specific sentence, that bargain is contingent on the district court accepting the agreement and its stipulated sentence. \*\*\*

> \* \* \*

> \*\*\* [T]here is no reason a defendant's eligibility for relief should turn on the form of his plea agreement." *Id.* at ___, 138 S. Ct. at 1776-77.

¶ 74    The prosecution argued that permitting Hughes to petition for reduction of his sentence "would deprive the Government of one of the benefits of its bargain— namely, the defendant's agreement to a particular sentence." *Id.* at ___, 138 S. Ct. at 1777. The Court rejected the argument, noting first that the statute made no exception for bargained pleas, as the bargain "has nothing to do with whether a defendant's sentence was based on the Sentencing Guidelines under § 3582(c)(2)." *Id.* at ___, 138 S. Ct. at 1777. The Court added:

> "Even if a defendant is eligible for relief, before a district court grants a reduction it must consider the [statutory] factors \*\*\* and the Commission's applicable policy statements. [Citation.] The district court can consider the benefits the defendant gained by entering a Type-C agreement when it decides whether a reduction is appropriate (or when it determines the extent of any reduction), for the statute permits but does not require the court to reduce a sentence." (Internal quotation marks omitted.) *Id.* at ___, 138 S. Ct. at 1777.

¶ 75    The Court reversed the judgments of the district court and the court of appeals and remanded for the district court to consider Hughes's petition for sentence reduction. *Id.* at ___, 138 S. Ct. at 1778.

¶ 76      Here, when the legislature adopted and amended section 2-1401(b-5), it made no exception for fully negotiated pleas. As the Court said in *Hughes*, "there is no reason a defendant's eligibility for relief should turn on the form of his plea agreement." *Id.* at ___, 138 S. Ct. at 1777. The legislature invited all offenders who are victims of domestic violence to petition the courts for modification of their sentences if their offenses related to the domestic violence. 735 ILCS 5/2-1401(b-5) (West 2016).

¶ 77      Subsection (b-5), like section 3582(c)(2), does not give defendants a legal right to a decreased sentence. As subsection (b-5)'s sponsors said in the debates, subsection (b-5) only gives the defendant the opportunity to present evidence that domestic violence related to her participation in the crime and the "opportunity to argue for a resentencing." 103d Ill. Gen. Assem., House Proceedings, May 11, 2023 (statements of Representative Cassidy) (unofficial transcript provided by petitioner). Subsection (b-5) "is not a mandate. It is an option for judges to provide post-judgment relief." 99th Ill. Gen. Assem., House Proceedings, May 25, 2015, at 29 (statements of Representative Mitchell).

¶ 78      When the prosecution and a defendant reach a fully negotiated plea agreement, the trial court retains discretion to accept or reject the agreed sentencing recommendation. *People v. Lambrechts*, 69 Ill. 2d 544, 556 (1977); *Flowers*, 208 Ill. 2d at 294-95; *People v. Bryant*, 2016 IL App (5th) 140334, ¶¶ 49-50. The court may not need to hold a hearing on aggravation and mitigation (see *People v. Fuca*, 43 Ill. 2d 182, 185-86 (1969)), but the court must "determin[e] that there is a factual basis for the plea" before imposing sentence (Ill. S. Ct. R. 402(c) (eff. July 1, 2012). The prosecution's recommendation for a fully negotiated sentence does not bind the State, as the State, acting through the courts, must accept the recommendation for the recommended sentence to take effect. Ill. S. Ct. R. 402(d)(2) (eff. July 1, 2012). The courts may consider modifying negotiated sentences under section 2-1401(b-5), but the modification, like the plea bargain, does not take effect unless the State, acting through the courts, agrees to the modification.

¶ 79      Ms. Wells's petition meets all the requirements of the statute. Subsection (b-5) authorizes her to present her evidence to the circuit court. The circuit court, which needed to decide whether to accept the State's fully negotiated sentencing recommendation, will then have the information it needs to decide whether her

evidence "is of such a conclusive character that it would likely change the sentence imposed by the original trial court." 735 ILCS 5/2-1401(b-5)(5) (West 2016). In my opinion, the appellate court correctly reversed the circuit court's decision and remanded the case for further proceedings on the petition.

¶ 80                                    III. CONCLUSION

¶ 81       In sum, ignoring the remedial purpose of subsection (b-5) and the legislature's intent, the majority reads into the statute an exception (subsection (b-5) does not apply in negotiated plea cases) and conditions (the defendant's plea must first be withdrawn before the court can reconsider the sentence) not expressed in the words of the statute. The majority also failed to consider *Hughes*, a case where the United States Supreme Court interpreted a federal sentence reduction statute. Following *Hughes*, I would find subsection (b-5) authorizes Ms. Wells to present her evidence that domestic violence related to her participation in the murder, so that the circuit court, on remand, may consider whether the evidence warrants a reduction of her sentence. Accordingly, I respectfully dissent.

¶ 82       JUSTICE O'BRIEN took no part in the consideration or decision of this case.